**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Naif AL–YOUSIF, a/k/a Naif Al–Yousir, Defendant–Appellee.**

**No. 01SA415.**

Supreme Court of Colorado, En Banc.

July 1, 2002.

A. William Ritter, Jr., District Attorney, Robert J. Whitley, Chief Appellate Deputy District Attorney, Denver, Colorado, Attorneys for Plaintiff–Appellant.

Isaacson, Rosenbaum, Woods & Levy, PC, Gary Lozow, Blain D. Myhre, Lisa D.L. Williams, Denver, Colorado, Attorneys for Defendant–Appellee.

Justice KOURLIS delivered the Opinion of the Court.

In this case, we must determine whether to uphold a trial court order suppressing the defendant's statement. The defendant, a native of Saudi Arabia who had lived in the United States for four years, gave the statement after hearing the *Miranda* rights read to him in English and after agreeing that he understood. The trial court ruled that the defendant did not make a valid waiver of his rights. We conclude that the trial court required a deeper appreciation of the implications and consequences of a waiver than does our case law. Because the question of whether the defendant sufficiently understood his rights to waive them is essentially a conclusion of law, we review it de novo. Based upon that review, including a thorough review of the videotaped interview with the defendant, we now conclude that the defendant did sufficiently understand his rights and that the waiver was, therefore, valid. Accordingly, we reverse the trial court order.

## I. Facts

Denver police arrested the defendant, Naif Al–Yousif, a native of Saudi Arabia, in connection with the murder of Abdulaziz Al–Kohaji. At the time of the arrest, the twenty-two-year-old defendant had resided in the United States for four years and had intermittently attended school including English language classes. The arrest took place at the Denver bus station and during the ride to the police station, the defendant told detectives, "I know all about it." Detective Guigli, who was heading the investigation and who was sitting behind Al–Yousif in the car, gave the defendant a brief oral advisement of his rights and then told him to be quiet until they reached the station.

Once at the station, two detectives, Guigli and another named Martinez, began questioning the defendant in a video interview room. They informed Al–Yousif that the interview would be video- and audiotaped. Detective Martinez told Al Yousif that they "needed to get some paperwork out of the way," and then proceeded to ask him several routine intake questions. After that, Martinez said that he was going to tell Al–Yousif about his rights. Martinez read the traditional *Miranda* warnings [1] from a preprinted form. The detective instructed Al–Yousif to sign the form in two places; Al–Yousif complied. When the detectives asked the defendant whether they had coerced him or threatened him to make a statement, Al–Yousif looked confused and replied, "What statement?" The detectives clarified they meant the statement the defendant was about to make, and Al–Yousif then responded that no coercion had taken place.

Initially, Al–Yousif denied any knowledge of the murder. When Guigli reminded him that he had already said he "knew all about it," Al–Yousif indicated that he wanted to speak to the victim's uncle before talking to police. The detectives denied this request. As the interview continued, Al–Yousif began making incriminating statements and little by little revealed his role in the murder. The ninety-minute interview ended with Al–Yousif agreeing to take the detectives to a dumpster where he and his cohorts had dumped the victim's body.

When the officers and Al–Yousif returned to the police station from visiting the dumpster, two new officers began to interview Al–Yousif, Detective Vigil and Detective Schneider. Vigil re-advised the defendant of his rights under *Miranda*, and Al–Yousif said he wanted a lawyer. The officers terminated the interview.

In a pretrial hearing, the trial judge suppressed Al Yousif's statement to police as being obtained in violation of the Fifth Amendment. After finding that the statement was voluntarily given, the judge concluded that "the People have failed to sustain

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

their burden of proving by a preponderance of the evidence that defendant made a knowing and intelligent waiver of his *Miranda* rights." The court found the evidence insufficient to support a conclusion that Al–Yousif was "fully aware of the nature of the right to remain silent ... and the consequences of abandoning that right," as required under *People v. Kaiser,* 32 P.3d 480 (Colo.2001). The People took this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (2001).

## II. Trial Court's Findings

The trial court's order is thorough and thoughtful. It begins with a narrative of "undisputed facts" accompanied thereafter by the court's resolution of the following "disputed facts": (1) the defendant's background and fluency in English; and (2) the defendant's understanding of his *Miranda* rights and the waiver.[2] The judge examined each in turn, weighing the credibility of the various witnesses and explaining his perspective on those questions in detail.

In the "conclusions of law" section of the order, the trial judge examined, again in substantial detail, the factors set forth by this court in *Kaiser.* One by one, the court rendered determinations on the evidence as it related to each factor.

First, addressing the "time interval" factor, the judge found that a "very brief" time had passed between the advisement and the subsequent interrogation.

Second, concerning who initiated the interview, the judge found that the detectives had initiated it, although Al–Yousif had earlier demonstrated "some eagerness to talk with the detectives."

Third, on efforts made to remind the defendant of his rights, the court found "no effort [was made] to remind defendant of his rights or give a fuller explanation of them during the course of the interrogation."

Fourth, the court found, "Defendant's acknowledgment of the rights and his waiver were so perfunctory as to be meaningless for a person with defendant's background. The advisement was cursory at best."

Fifth, the trial judge ruled that Al–Yousif "did not understand that he had the right to remain silent" as evidenced by his request to speak to the victim's uncle first, which the detectives denied.

Sixth, the court viewed the defendant's immediate request for an attorney the second time he was read the *Miranda* warnings as demonstrating definitively that the defendant had not understood his rights during the first advisement.

Seventh, the court concluded, based upon the testimony of Al–Yousif's peers and expert witnesses, that the defendant's English abilities were "limited."

Eighth, the court determined that the "defendant's cultural background as a citizen of Saudi Arabia made it impossible for him to understand and absorb the *Miranda* warnings without further explanation or elaboration."

Finally, the court concluded that Al–Yousif "displayed no lack of intelligence that would have impeded his understanding of an effective explanation of his rights."

Ultimately, the trial court ruled that, when all these factors were considered together, Al–Yousif had not knowingly and intelligently waived his constitutional rights.

## III. Standard of Review

We first note that the trial judge held the prosecution to the appropriate burden of proof. *People v. Gennings,* 808 P.2d 839, 843 (Colo.1991) (noting that the prosecution must prove the validity of the waiver by a preponderance of the evidence). Examining whether the prosecution has met this burden, courts apply a "totality of the circumstances" test. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (holding waivers valid "only if the 'totality of the circumstances surrounding the interrogation'

---

**2.** The trial judge also considered the following two "disputed facts": (3) the defendant's request to speak to the victim's uncle; and (4) the methods of interrogation used by the detectives. However, because we believe this case turns on the first two issues, we find it unnecessary to review the latter two.

reveals both an uncoerced choice and the requisite level of comprehension" on behalf of the suspect) (citing *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

■ The courts must necessarily examine the objective circumstances surrounding the waiver in an effort to determine the suspect's level of understanding. *See Colorado v. Connelly*, 479 U.S. 157, 166–68, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *United States v. Yunis*, 859 F.2d 953, 965 (D.C.Cir.1988). In that context, it falls to the trial courts to resolve "disputed facts," and, as a reviewing court, we defer to the trial court's resolution of those disputed facts when the resolution is supported by competent evidence in the record. *People v. Miranda–Olivas*, 41 P.3d 658, 661 (Colo.2001); *Gennings*, 808 P.2d at 844. However, as we recently clarified in *People v. Matheny*, 46 P.3d 453 (Colo.2002), the appellate courts have an enhanced role in examining a trial court's application of law to fact, particularly in the arena of constitutional rights. *Id.* at 461–62. After acknowledging the traditional deference afforded a trial court on purely factual issues, *see People v. Quezada*, 731 P.2d 730, 732 (Colo.1987), we ruled in *Matheny* that the application of the legal standard to the facts, an exercise that resolves the "ultimate constitutional question," merits de novo review. *Matheny*, 46 P.3d at 462. Thus, where the historical facts are supported by competent evidence in the record, we will not disturb them. But interpreting the significance of those facts to resolve the constitutional question at hand we undertake as if for the first time. *See id.*

■ In this context, we accept those trial court findings that have support in the record, but the question of whether Al Yousif understood the *Miranda* warnings to the extent that his waiver was "knowing and intelligent," is a legal question that we review "de novo."

IV. The Test for Constitutional Sufficiency

■ As noted in 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.9(b), at 586 (2d ed.1999),

[a] waiver may be knowing and intelligent in the sense that there was awareness of the right to remain silent and a decision to forego that right, but yet not knowing and intelligent in the sense that the tactical error of that decision was not perceived. But this is no bar to an effective waiver for *Miranda* purposes, for it "is not in the sense of shrewdness that *Miranda* speaks of 'intelligent' waiver," and thus in "this context intelligence is not equated with wisdom."

The defendant need not understand every consequence of his decision to waive. *Colorado v. Spring*, 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

In *United States v. Yunis*, the D.C. Circuit Court of Appeals examined whether a statement made by a suspected airline hijacker, who had been arrested on a boat in international waters, was permissible under the Fifth Amendment. *Yunis*, 859 F.2d at 954–55. Yunis spoke "very little English" but was given an Arabic copy of the *Miranda* warnings, and an interpreter translated into Arabic the warnings as an FBI agent read them to Yunis aloud. *Id.* at 955–56. Yunis stated repeatedly that he understood the warnings, *id.*, but the trial judge nevertheless suppressed his statement after finding that Yunis was seasick at the time the FBI read the *Miranda* warnings and that there existed typographical errors in the Arabic copy. *Id.* at 957. Reversing, the court of appeals scrutinized the record and found several of the trial judge's "factual findings" were without support. *Id.* at 958–60. The court then applied the "knowing and intelligent" standard to the remaining facts under a totality analysis and found the statement was not taken in violation of the Fifth Amendment. Addressing the defendant's culture and background, the court observed:

Clearly, a defendant's alienage and unfamiliarity with the American legal system should be included among these objective factors. However, *the significance of these factors will be limited to determining whether a defendant knew and understood the warnings that were read to him.* The fact that a defendant's alien status may have prevented him

from understanding the full, tactical significance of his decision to confess will not invalidate his waiver.

*Id.* at 965 (emphasis added).

■ We agree with D.C. Circuit Court of Appeals that the defendant's cultural background as it bears upon his understanding has limited relevance: it goes only to whether he understood his basic choices—not whether he understood the tactical advantages of each or the constitutional premises upon which they are based. Rather, the state must present evidence sufficient merely to "demonstrate that the accused understood that he did not have to speak, that he had the right to the presence of counsel, and that the state could use what he said in a later trial against him." *People v. Daoud*, 462 Mich. 621, 614 N.W.2d 152, 159 (2000). We also agree with the Michigan Supreme Court that one of the reasons for requiring only the most basic of understandings relates to the underlying purposes of *Miranda*, to wit: "Excluding otherwise validly obtained confessions on the basis that the defendant subjectively did not understand his rights, although there were no signs indicating any degree of confusion" serves no purpose because "[t]here is nothing more the police could do, nor is there any objectionable police behavior." *People v. Cheatham*, 453 Mich. 1, 551 N.W.2d 355, 364 (1996).

## V. Analysis

With that test in mind, we turn to the facts of this case.

### A. Al-Yousif's English Abilities

After examining the evidence, the trial court concluded:

> Although [the defendant] did frequently respond "Huh?" to questions and had trouble with certain words (e.g., "statement," "hollering," "forged," "sacrilege," "voluntary"), he responded appropriately to most of the questions posed to him. His spoken English is somewhat broken and difficult to understand but, as the witnesses testified, adequate for casual conversation.

We disagree that Al-Yousif misunderstood the word "statement." When asked whether his "statement was voluntarily given," Al-Yousif looked confused and said, "What statement?" (not, "What is a statement?"). The tape demonstrates he knew the word "statement," but thought the detectives were talking about a statement he had already made. With that exception, we find support in the record for the trial court's determination that Al-Yousif had English abilities adequate for casual conversation.

### B. Al-Yousif's Understanding of the *Miranda* Warnings

■ Whether the defendant's grasp of "casual" English includes comprehension of the *Miranda* warning's content was the subject of the trial court's resolution of the second "disputed fact." Describing this critical point as a "disputed fact," however, is something of a mischaracterization. In this particular case, whether Al-Yousif understood the *Miranda* warnings is a question inseparable from the constitutional question of whether his waiver was knowing and intelligent. Resolution of one necessarily resolves the other, i.e., if he understood, his waiver was unquestioningly valid, and if he did not understand, the waiver was invalid. Thus, Al-Yousif's understanding of the *Miranda* waiver is not a question of historical fact to which we might otherwise owe deference. Rather, it resolves the ultimate legal question, and we review the conclusion de novo.

The judge considered the rapid reading of the rights (eighteen seconds) and the fact that the position of the form did not allow Al-Yousif to read along. Also, the judge noted that the defendant did not initial each of the rights after it was read. The judge further observed that none of the detectives considered finding an Arabic interpreter or inquired into Al-Yousif's proficiency in English comprehension, even though it was apparent that his English skills were limited.

The judge then turned to the fact that the *Miranda* warnings given later in the afternoon were accompanied by explanation, and, "When Detective Vigil made clear that defendant could have a lawyer sitting with him in the interview, defendant immediately said, 'I want a lawyer.'" This led the trial judge to

believe that the defendant had not understood that specific right the first time.

Finally, the trial judge credited the testimony of three expert witnesses. The second such witness was Dr. Kholwadia, who holds a Ph.D. in Arabic language, Islamic law, and Saudi Arabian culture. The trial judge found him "thoughtful, credible and extraordinarily well credentialed." The trial judge explained:

> He expressed the firm opinion that defendant did not understand the rights read to him or the concept of waiving those rights. This was based partly on defendant's difficulty with English and the manner in which the rights were read. Dr. Kholwadia added important explanations of the cultural background of a Saudi Arabian student.... He opined that some of the terms used in the advisement such as "right" and "evidence" could translate into two or three different meanings.... Dr. Kholwadia went over the advisement form with the defendant the day he testified, trying to explain it to him. He said that defendant now understands the words but still has trouble with the concept of the right to remain silent.

The judge also credited the testimony of a linguistics professor, Dr. Slakey, who had taught Al–Yousif at school. The professor examined the readability level of the *Miranda* warnings according to a standardized test and opined that the text required a seventh-grade reading level. He then compared that with the fifth-grade reading level defendant possessed when he left the school. The judge also noted that the professor testified by phone so that his credibility could not be fully evaluated, but that "his opinions made sense and his experience teaching defendant was a valuable perspective." To the above findings that are purely factual, and to the credibility determinations, we owe deference because they are supported in the record.

After examining this evidence, the trial judge rendered the legal conclusion that Al–Yousif did not "understand" the *Miranda* warnings, and that, therefore, the prosecution failed to meet its burden of proving a knowing and intelligent waiver. As indicated above, we review that conclusion de novo. We hold that if these facts do not achieve a valid waiver, then the trial court raised the "knowing and intelligent" constitutional bar too high.

We note at the outset that the video's existence enables us to undertake this review not just from the "cold record," but—at least in part—in precisely the same manner as the trial court. *See Colo. Dep't of Pers. v. Alexander,* 970 P.2d 459, 467 (Colo.1998) ("An appellate court may draw its own conclusions from operative documentary material in the record."); *see also People v. Medina,* 25 P.3d 1216, 1223–28 (Colo.2001) (independently reviewing and analyzing video- and audiotape evidence).

The tape shows that the defendant clearly understood the following terms and phrases: dates and times, addresses and numbers, days and months, and the words: "sign," "signature," "threat," "videotape," "audiotape," "understand," "student," "picked up," "kidnapped," "apartment," "relax," "sold," "caught," "arrive," "detective," "cousin," "everyday," "wealthy," "rope," "cause," "reason," "character," "garbage," "munchies," "upstairs," "downstairs," "friend," "divide," "right," "left," "legs," "own," "owner," "clothes," "naked," "laptop," "truth," "forgive," "prison," "afraid," and "jewelry." The defendant either used these words himself, or responded appropriately when the detectives used them. On the other hand, the defendant clearly did not understand these words: "hollering," "remorse," "hardware," "forge," "motive," "bills," "bundle," "dumpster," "punishment," "suitcase," "finished basement," "desecrate," "sacrilege," and "sacrificial altar." [3]

The video revealed that when the detectives spoke in lengthy sentences, the defendant was more apt to become confused, especially when those sentences were spoken rapidly. The *Miranda* warnings were given in unbroken, quickly read, but short sentences. Also, we witnessed the defendant

---

**3.** Numerous additional terms used in the video were inconclusive, such as "voluntarily," "coerce," "involved," and "struggle." Al–Yousif may or may not have understood their meaning.

ask the detectives for clarification when he did not understand a question or a certain word. Al–Yousif asked no questions during the reading of the *Miranda* warnings. Indeed, Al–Yousif himself stated that he understood the *Miranda* rights when they were read to him. Such an acknowledgement was important to our holding in *Kaiser*, 32 P.3d at 486, and *People v. Jordan*, 891 P.2d 1010, 1015–16 (Colo.1995). Based upon our review of the taped interviews, we conclude that Al–Yousif evidenced a sufficient level of understanding to permit reliance upon his waiver of *Miranda* rights.

■ Unlike the trial court, we do not afford much weight to the fact that, after the defendant had shown the police the location of the victim's body and returned to the station for additional questioning, he then requested an attorney following readvisement. It is certainly not inconceivable that, in the first interview, following advisement, the defendant intended to talk to the investigators and deflect suspicion from himself through his answers. After the first interview and the interlude in which he took the officers to the dumpster where the body had been located, he may well have absorbed the extent to which he had implicated himself and began having second thoughts. The fact that he asked for a lawyer after the second advisement is not, to us, evidence that he did not understand his right to do so after the first advisement given the intervening events. Again, we do not deal with the wisdom of a waiver, only its objective legitimacy.

■ Lastly, we turn to the evidence regarding Al–Yousif's cultural background, upon which the trial court relied. As we have indicated, the relevance of such evidence is limited. Whether a defendant had the cultural background to understand the origin or purpose of constitutional rights, or

the tactical implications of waiving them, is not at issue. A particular defendant's length of time in the country, education, religion, background, age, and intelligence certainly bear on his depth of understanding. But the relevance of those factors in the totality analysis here is limited to the simple question of whether the defendant grasped three precepts: (1) he did not have to talk, (2) he could have an attorney present, and (3) if he did talk, his statements could be used against him.[4] To broaden the inquiry beyond that simple question undermines the admissibility of confessions that are validly obtained, with no police misconduct, from a willing and adequately informed suspect. Accordingly, the testimony of Dr. Kholwadia does not, in our view, dispel the conclusion that Al–Yousif had the necessary level of rudimentary understanding.

## VI. Conclusion

The trial court in this case applied a legal standard concerning the meaning of "knowing" and "intelligent" that included aspects of tactical understanding that surpass what is required for a supportable *Miranda* advisement and waiver. Under our de novo review of the trial court's conclusion, we look to whether the defendant minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction. Measuring that legal standard against the trial court's findings of historical fact, and our own review of the videotape, we determine that Al–Yousif's waiver of his *Miranda* rights was sufficiently knowing and intelligent to pass constitutional muster. Accordingly, we reverse the trial court's order of suppression and remand the

---

**4.** We distinguish *People v. Jiminez*, 863 P.2d 981, 984–85 (Colo.1993), in which we upheld a trial court's suppression of a confession of a Kickapoo Indian defendant on the grounds, not that he was culturally unable to understand his rights, but rather that his mental disability rendered him incapable of understanding them. In that case, the defendant functioned at a six-year-old level, had never attended school, had very limited language abilities, even in his native Kickapoo, and had no understanding of abstract concepts. *Id.*

at 982–83. The sheriff's office conducting the interrogation read the *Miranda* warnings in Spanish further impeding the defendant's ability to comprehend the warnings because of his very limited Spanish vocabulary. *Id.* at 982–85. We also distinguish *People v. Mejia–Mendoza*, 965 P.2d 777, 781 (Colo.1998), in which we upheld the suppression of a native Spanish speaker's statement where the interpreter mistranslated the *Miranda* advisement.

case for further proceedings consistent with this opinion.

Justice BENDER dissents, and Justice MARTINEZ joins in the dissent.

Justice BENDER, dissenting.

### Introduction

The trial court found the following facts related to the defendant's ability to understand the *Miranda* rights that were read to him.[5] The defendant is a twenty-two-year-old Saudi Arabian citizen with no previous contact with the American criminal justice system. He was initially read his *Miranda* rights in a rapid and cursory manner. Three experts, including an Arabic language expert, viewed the videotaped advisement and testified that the defendant had not understood his rights.

The Saudi Arabian legal system varies greatly from ours. Criminal suspects in Saudi Arabia have no choice but to speak with the police. When a crime has occurred in Saudi Arabia, the victim's family has a great deal of input into whether a punishment is imposed and to what degree. Before answering police questions, but immediately after the *Miranda* advisement, the defendant requested to speak with the victim's uncle.

The defendant possesses a somewhat limited understanding of the English language. He has difficulty comprehending abstract ideas and, when he encounters statements or words that he does not understand, he, like many intermediate students of English, will often nod his head as if he does understand. The *Miranda* advisement requires a seventh-grade reading level for a native speaker; the defendant's English skills are at a fifth-grade level of proficiency. When the *Miranda* warning was explained in detail to him at a second interview, the defendant immediately requested an attorney. In light of these and other facts, the trial court concluded that the prosecution had failed to sustain its burden of demonstrating that the defendant's waiver of his *Miranda* rights was "knowing and intelligent."

In my view, the trial court made the correct ruling based upon the evidence before it and the applicable law. The majority, however, fails to credit the importance of the numerous historical findings of fact made by the trial court, including the fact that the defendant had substantial language and cultural barriers that impeded his ability to understand, and therefore to waive, his *Miranda* rights. I respectfully dissent.

### Discussion

Numerous expert and lay witnesses testified as to the defendant's ability to comprehend English generally and the *Miranda* warnings specifically.

Jeanne Hind, the defendant's former English teacher, testified that the defendant could carry on an informal social conversation in English but that he was rather weak in the nuances of the language and in understanding and speaking in abstract terms. Professor Slakey, another of the defendant's former teachers, stated that the defendant had achieved approximately a fifth-grade level based on tests of English reading ability and that his skills had "fossilized" after reaching a certain level of proficiency. Both former teachers testified that, like many intermediate students of English, the defendant would nod and say he understood what was being said to him when he was actually missing much of the meaning.

Friends of the defendant confirmed these professional observations. One friend testified that the defendant could carry on a superficial conversation but was difficult to understand and frequently asked his Arabic-speaking friends for translations. Another friend described a situation in which he had had to help the defendant fill out a simple college form.

Jeanne Hind, Professor Slakey, and Dr. Kholwadia viewed the videotaped interrogations and testified specifically about the *Miranda* advisement and the defendant's ability to understand it based on both linguistic and cultural factors. Dr. Kholwadia, whom the trial court explicitly found to be "thoughtful, credible and extraordinarily well credent-

---

**5.** The trial court order, in its entirety, is append-   ed hereto.

ialed," testified that the concept of having the option not to talk to police authorities was foreign to defendant as it would be to most Saudis, since refusal to talk to the police in Saudi Arabia is not an option. He also explained how nodding is very cultural and does not necessarily mean that an Arab person understands everything; instead, it may indicate that the individual needs further explanation. Dr. Kholwadia testified that specific words in the *Miranda* advisement could be confusing to the defendant[6] and how a recent interview with the defendant had revealed that he, on the date of the evidentiary hearing, still had difficulty comprehending the concept of the right to remain silent.

Jeanne Hind pointed out, among other things, that the passive voice used in the second right of the *Miranda* advisement, as well as the conditional construction of the fourth right, can be confusing to foreign students. Professor Slakey testified that comprehension of the advisement requires a seventh-grade reading level for a native speaker.

Two of the defendant's friends opined that, based on their experience dealing with the defendant, he could not have understood the rights on the advisement form. Indeed, one witness testified that the defendant could follow the words of the *Miranda* rights but was unlikely to grasp the real meaning without explanation.

The videotaped interrogation shows the defendant making repeated requests to talk to the victim's uncle. The first of these requests occurred immediately after the reading of the *Miranda* advisement:

> Detective Guigli: And you're voluntarily going to talk to us about what happened?
>
> Al–Yousif: No, I'm not going to talk [shakes head negatively]. Not until his uncle come in here.
>
> Detective Guigli: Okay, but you understand though that we have to first sit down and talk about what happened before—
>
> Al–Yousif: We'll talk, we'll talk [nods head affirmatively].

At some point during the interrogation, the defendant explained to the detectives that he wished to talk to the victim's uncle because, in Saudi Arabia, the victim's family decides what the criminal's punishment should be. If beheading is requested, it will occur. The converse is also true: if the victim's family wants the criminal to be let go, he will be. With regards to this evidence, the trial court stated that the defendant's "expectations about the controlling influence [that] the victim's family would have on the process show his profound lack of understanding of criminal justice in the United States."

Additionally, the trial court was impressed by the differences between two separate interviews of the defendant, each with its own *Miranda* advisement. In the first, the *Miranda* rights were read during an eighteen-second time period and were not accompanied by any explanation of each right. The second interview, which was conducted by different officers and occurred just a few hours after the first, involved a more detailed explanation of each right. According to Professor Slakey, the detective delivering the second advisement used techniques to ensure defendant's comprehension, similar to techniques used by teachers of English to foreign students. When the officer explained that the defendant could have a lawyer sitting with him during the interview, the defendant immediately said, "I want a lawyer."

In light of all of these historical facts, the trial court decided that the prosecution had not sustained its burden of demonstrating that the defendant's waiver was knowing and intelligent. I agree.

Statements made by a criminal defendant to police may be admitted at trial only if the prosecution satisfies its burden of demonstrating "that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This means that the waiver must be made "with a full awareness both of the

---

**6.** Specifically, the trial court stated that Dr. Kholwadia testified that "some of the terms used in the advisement such as 'right' and 'evidence' could translate into two or three different mean-ings," and that "[w]hile 'lawyer' translates accurately, in Saudi Arabia, most lawyers deal with commercial law and are not frequent fixtures in criminal cases."

nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *see also People v. Kaiser*, 32 P.3d 480, 484 (Colo. 2001); *People v. Jordan*, 891 P.2d 1010, 1014 (Colo.1995); *People v. Jiminez*, 863 P.2d 981, 984 (Colo.1993); *People v. May*, 859 P.2d 879, 882 (Colo.1993). Thus, the question is not whether the police engaged in any misconduct; instead, our inquiry focuses on the level of understanding experienced by the defendant. *May*, 859 P.2d at 883.

I agree with the majority that this standard does not demand comprehensive understanding of all aspects of constitutional jurisprudence. Nor does the defendant need grasp all nuances of a waiver of his rights. Nonetheless, there is some minimal level of understanding that is demanded by the Constitution—a requisite level of comprehension that must be attained—before a waiver of rights may be deemed effective. *People v. Owens*, 969 P.2d 704, 707 (Colo.1999) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)); 2 Wayne R. LaFave et al., *Criminal Procedure* § 6.9(b) (2d ed.1999). As mentioned above, he must have a full awareness of the nature of the rights involved, as well the consequences of a waiver of those rights. As the Illinois Supreme Court has noted, "[T]o waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *People v. Bernasco*, 138 Ill.2d 349, 150 Ill.Dec. 155, 562 N.E.2d 958, 964 (1990) (holding that the waiver of a seventeen-year-old who had a fourth-grade comprehension level was invalid).

In determining whether a particular defendant's waiver was knowing and intelligent, courts must consider the totality of circumstances. *Kaiser*, 32 P.3d at 484; *Jordan*, 891 P.2d at 1014–15; *Jiminez*, 863 P.2d at 984. There are numerous facts relevant to a determination of whether a particular defendant understood his rights and the consequences of a waiver of those rights. These include, but are not limited to, the time interval between the initial *Miranda* advisement and any subsequent interrogation; whether the defendant or the interrogating officer initiated the interview; whether and to what extent the interrogating officer reminded the defendant of his rights prior to the interrogation by asking him if he recalled his rights, understood them, or wanted an attorney; the clarity and form of the defendant's acknowledgment and waiver; the background and experience of the defendant in connection with the criminal justice system; any language barriers encountered by the defendant; and the defendant's age, experience, education, background and intelligence. *Kaiser*, 32 P.3d at 484; *Owens*, 969 P.2d at 707; *People v. Mejia–Mendoza*, 965 P.2d 777, 780 (Colo.1998) (stating that language barriers must be considered when evaluating whether a waiver was knowing and intelligent); *People v. Delgado*, 832 P.2d 971, 973 (Colo.App.1991); *see also* LaFave, *supra*, § 6.9(b).

The trial court in this case examined each of these factors and, in a well-reasoned and thorough order, determined that the totality of the circumstances indicated that the defendant's waiver of his rights was not knowing and intelligent.

The majority states that we must resolve the "simple" question of whether the defendant grasped that he did not have to talk, that he could request an attorney, and that, if he did talk, his statements could be used against him. While I agree that this is the question that we must answer, I do not agree that it is a "simple" question. Instead, my belief is that this is an exceedingly complicated question requiring consideration of numerous factors, including the defendant's proficiency in English, cultural background, responses during the *Miranda* advisement, the entirety of the defendant's interaction with the police, age, contact with the American criminal justice system, experience, education, intelligence, and religion.

The *Miranda* advisement breaks down into words and concepts: the right to remain silent; the idea that anything one says can be used against oneself; the right to have an attorney present; and the right to have an attorney appointed if one is unable to afford such an attorney. In turn, each of these individual rights breaks down into specific

words and concepts. To understand the right to remain silent, one must be able to grasp the abstract idea of what a "right" is as well as the implicit meaning that "the right to remain silent" means that one can be silent in response to police questioning, that one need not answer police questions if one does not so desire.

In my view, a criminal suspect must understand both the words used in the *Miranda* warnings and the abstract concepts that those words represent before a waiver can accurately be described as being "knowing and intelligent." I believe that courts must consider all circumstances that bear on a defendant's ability to understand *Miranda* words and concepts before concluding that the defendant did understand the advisement and knowingly waived his rights. In contrast, the majority seems to contemplate a regime where each individual word in the warning can be understood in isolation; if the individual words are understood, then the ultimate message has been delivered.

The majority also gives great weight to the fact that, in this case, the defendant responded affirmatively to the police question of whether he understood his rights. However, such an affirmative response is not dispositive. *See, e.g., United States v. Porter,* 764 F.2d 1, 7 (1st Cir.1985) ("Merely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. *Miranda* requires the interrogating officer to go further and make sure that the accused, *knowing his rights,* voluntarily relinquishes them.") (emphasis added). The presence of other evidence may indicate that a waiver is not knowing and intelligent. Such evidence exists in this case. The trial court found, as a matter of fact, that the defendant would nod his head when he did not actually understand what was said to him, that he had trouble grasping abstract concepts in English, that there were very real cultural barriers that impeded his ability to understand his *Miranda* rights, and that the defendant's response to the police changed dramatically when the *Miranda* rights were explained to him in a way that he could understand.

Based on my reading of *People v. Matheny,* 46 P.3d 453 (Colo.2002), the trial court's role is to gather all facts that might bear upon the ultimate question of whether the waiver was knowing and intelligent—those facts known as "historical facts." So long as historical facts find support in the record, an appellate court must accept those historical facts as true. The majority in this case purports to defer to the trial court on findings of historical fact—even going so far as to state that there is support in the record for all but one of those facts [7]—but does not do so. Instead, it makes its own findings of fact based solely on its viewing of the videotape and in disregard of the other evidence presented.

In my view, the majority fails to afford sufficient weight to the trial court's factual findings. The rule of deference to the trial court, as factfinder, reflects the reality that the trial court is in the unique position of being able to determine the credibility of witnesses and to weigh conflicting evidence in determining historical facts.[8] Thus, this court should not usurp the trial court's func-

---

7. The majority rejects the trial court's finding that the defendant did not understand the word "statement." In this vein, I note that the portion of the video relied upon by the majority in reaching this conclusion occurs very quickly and that, in my opinion, the dialogue on the video may support the trial court's conclusion that the defendant did not understand the word "statement," but definitely does not support the majority's assertion that the defendant did understand this word.

8. *See, e.g., Mejia–Mendoza,* 965 P.2d at 780 ("Appellate courts are not the appropriate forum to resolve factual discrepancies or to determine the credibility of witnesses."); *People v. Fish,* 660 P.2d 505, 509 (Colo.1983) ("An appellate court is in no position to weigh conflicting testimony presented to the trial court. On review, we are bound by the trial court's findings of fact where they are supported by adequate evidence in the record."); *People v. Kelley,* 172 Colo. 39, 40, 470 P.2d 32, 33 (1970) (holding that it is the function of the trial court, not the reviewing court, to weigh the evidence and make a finding on the pertinent issues at a suppression hearing); *People v. Scott,* 198 Colo. 371, 373, 600 P.2d 68, 69 (1979) ("We have long recognized that an appellate court is in no position to weigh the conflicting testimony presented to the trial court. A cold record is a poor substitute for live testimony.").

tion except in the clearest of cases. These are important principles that should not be lightly ignored. Our ability to view one piece of evidence, the videotape of the interrogations, in the same manner as the trial court does not change this fundamental precept. The video must be considered in combination with the other evidence presented at trial, including the defendant's English test scores and the testimony of numerous expert and lay witnesses. This other evidence sheds light on what meaning should be attributed to the behaviors captured by the videotape. Only the trial court, not this court, is in the position to undertake this analysis of the evidence.

After making its own determinations, apparently based only upon the videotape and in disregard of much of the evidence presented to the trial court, as to the defendant's English skills, the majority concludes that the videotape "evidenced a sufficient level of understanding to permit reliance upon his waiver of *Miranda* rights."[9]  Maj. op. at 1172.

While I do not disagree that the videotape provides some objective evidence of the defendant's comprehension of his rights, it is not the exclusive evidence in this case and should not be considered in isolation, as the majority does. Other evidence can and does explain the behaviors exhibited by the defendant during the interrogation. Our constitutional jurisprudence requires us to consider the totality of the circumstances. Thus, this court should not, as the majority does, ignore important evidence related to the defendant's ability to understand the *Miranda* advisement given.

The majority dismisses two sorts of evidence which were relied upon by the trial court and which bring into question the validity of the waiver: (1) the differences between the first and second interrogations; and (2) cultural differences.

Although numerous reasons might explain why the defendant chose to assert his constitutional rights at the second interview, one likely explanation—particularly given the

timing of the assertion of his rights—is that the second interviewers' more detailed explanations of the *Miranda* rights made sense to the defendant while the first interviewers' cursory explanation had not. The defendant's immediate exercise of his rights, once they were more thoroughly explained to him, indicates that he did not understand his rights the first time they were read to him. While it is doubtful that this evidence alone would be dispositive, it must be considered along with the other evidence. This is the meaning of the "totality of circumstances" approach.

In its discussion of the law, the majority acknowledges that cultural factors may be used to determine whether a criminal suspect understood the advisement given. Maj. op. at 1169–1170. But then it does not apply this acknowledged principle to the facts of this case. Instead, the majority summarily dismisses the role that such cultural factors played. *Id.* at 1172. If the majority cannot see that cultural factors played a role in this case, I cannot imagine a situation in which the majority would accept and give weight to such factors.

Finally, I note that the majority glosses over its failure to consider the totality of the circumstances with its suggestion that the trial court in this case simply demanded too high of a level of comprehension from the defendant. I do not believe this to be the case. The trial court simply demanded, as this court should, that the prosecution prove that the defendant understood the nature of his rights. The trial court said it best: "If the type of advisement given here is found to be sufficient, the advisement requirement becomes a sham."

I am authorized to say that Justice MARTINEZ joins in this dissent.

### APPENDIX A

### DISTRICT COURT
### CITY AND COUNTY OF DENVER, COLORADO

Plaintiff:

---

9. This statement hints that estoppel principles might apply to a waiver. This is not the case. The question is whether the defendant actually understood his rights, not whether it appeared to

the police that the defendant understood them or whether it was reasonable for the police to rely on an apparently knowing waiver.

PEOPLE OF THE STATE OF COLORA-
DO

Defendant:

NAIF AL–YOUSIF a/k/a Nair Alyousir

Case Number: 01 CR 1861

Courtroom 17

### ORDER ON MOTION TO SUPPRESS STATEMENTS

Defendant is charged with first degree murder after deliberation, conspiracy to commit first degree murder, felony murder, robbery and conspiracy to commit robbery. These charges arise from the death of Abdulaziz Al–Kohaji, which was discovered in January of 2001. Defendant moves to suppress certain statements he made to officers of the Denver Police Department. Defendant argues: 1) that he did not knowingly and intelligently waive his *Miranda* rights; 2) that the statements were not voluntary; and 3) that his request to cease the interrogation was not honored. After hearing evidence over portions of four different days, reviewing the exhibits received in evidence, hearing the arguments of counsel and reviewing the relevant authorities, I now make the following findings of fact and conclusions of law.

## I. UNDISPUTED FACTS

The following facts are undisputed. In January of 2001, the Denver Police Department was investigating the reported disappearance of Mr. Al–Kohaji. That investigation was led by Detective Gene Guigli of the missing persons unit. After some time, the investigation focused on defendant who was a friend of Mr. Al–Kohaji. Defendant had no prior criminal record.

On January 31, 2001, Detective Guigli received information that defendant was traveling to Denver by bus from Albuquerque where he had been involved in a rollover motor vehicle accident. Detective Guigli arranged to meet the bus with other detectives. Before the bus arrived in Denver, defendant had already been handcuffed on the bus by a private investigator hired by the victim's family. Detective Guigli arrested defendant at the bus station and transported him to Denver Police headquarters. During this brief ride, defendant said, "I know all about it" or words to that effect and seemed eager to talk to the detectives. Detective Guigli gave him a brief oral advisement of his rights and told him to be quiet until they reached headquarters.

Beginning at approximately 8 a.m. on January 31, 2001, defendant was interviewed in a video interview room at Denver police headquarters. The interview was conducted by Detective Guigli and Detective Mike Martinez of the homicide unit. They were joined during the course of the interview by Detective Schneider, also a homicide detective. The interview was videotaped, and the videotape was received in evidence (Exhibit 2).

Detective Martinez read defendant his *Miranda* rights from a standard Denver Police Department form (Exhibit 1) and had defendant sign the form in two places. All three detectives were in civilian clothing and at least two were armed. There were no threats or physical coercion during the interview. The interview lasted approximately 90 minutes. After initially denying any knowledge of Mr. AI–Kohaji's disappearance, defendant made certain incriminating statements. Defendant told the detectives that he saw Mr. AI–Kohaji killed by defendant's two roommates and that he could show the detectives the location of a dumpster where he and his roommates dumped the body.

The interview was then terminated, and defendant directed the detectives to a dumpster in an apartment complex in Littleton where he said the body had been dumped. No other questioning occurred during the trip from Denver police headquarters to Littleton. Defendant was returned to headquarters, and at approximately 1:50 p .m., a second videotaped interview was commenced by Detective Martin Vigil of the homicide unit, accompanied by Detective Schneider. Detective Vigil advised defendant of his *Miranda* rights. Defendant immediately said he wanted a lawyer, and the interview was terminated.

Mr. AI–Kohaji's body was eventually located in a landfill where the dumpster identified by defendant had been emptied.

Resolution of defendant's motion to suppress turns on four areas of factual dispute:

1. Defendant's background and fluency in English;
2. Defendant's understanding of his *Miranda* rights and the waiver;
3. Defendant's request to speak to the victim's uncle; and
4. The methods of interrogation used by the detectives.

## II. DEFENDANT'S BACKGROUND AND FLUENCY IN ENGLISH

Defendant is a citizen of Saudi Arabia. He was 22 years old at the time of the interview. Defendant came to the United States in August of 1996 at age 17 to study English. He attended Spring International, an English language program for foreign students, for approximately 14 months until he departed in October of 1997. He began at the beginner level with no English comprehension or speaking ability. When he left Spring, he had reached level 4, an intermediate level characterized by an ability to carry on a basic conversation. Defendant once failed level 3 at Spring and was given a one-on-one tutor for nine weeks. His attendance at classes lagged towards the end of his tenure at Spring.

Jeanne Hind, director of the Spring program, testified that defendant was able to carry on an informal social conversation in English. He was typical of students who reach level 4 in being rather weak in the nuances of the language and in understanding and speaking in abstract terms. She testified that defendant scored a 48 on the Michigan English Language Assessment Battery shortly before he left Spring which would put him at a low level 3.

Defendant moved to California where he attended San Joaquin Delta College from summer of 1998 through the fall semester of 1999 (Exhibit E). Defendant took courses in English as a second language as well as some computer-related and economics courses. He flunked the two economics courses he took and received a B, C and D in the three computer courses he completed. A professor who taught him in two courses at that community college, Mark Slakey, testified that defendant had achieved approximately a fifth grade level based on tests of English reading ability. Professor Slakey described defendant as a student who struggled, missed classes, failed tests and seemed troubled and moody. Professor Slakey also expressed the opinion that defendant's command of English had "fossilized" since he left Spring in October of 1997. He explained this as a common phenomenon among foreign students who reach a certain level of English proficiency and are unable to progress further.

Both Professor Slakey and Ms. Hind testified that, like many intermediate students of English, defendant would nod and say he understood what was being said to him when he was actually missing much of the meaning.

In October of 2001, for purposes of this case, the Test of English as a Foreign Language was administered to defendant. He scored an 83 which was described by Ms. Hind as a very low score which was comparable to the score he achieved on the Michigan test almost four years earlier. Both of these tests measure a student's academic ability in English rather than his ability to carry on a conversation.

Two contemporaries who were friends of defendant testified that defendant's ability in English was limited or poor. Angela Kirk said that defendant could carry on a superficial conversation but was difficult to understand and frequently asked his Arabic-speaking friends for translations. He asked her for help in filling out a simple college form. Abdulaziz Almashouti, who is a student here from Kuwait and speaks Arabic, testified by deposition that defendant's English was poor, that school was difficult for defendant and that he tried to help defendant with basic forms to transfer credits to another school. He also recalled that, when defendant returned to Denver in 1999 or 2000, defendant went with him to restaurants, movies and clubs and that defendant and his roommates watched "gangster movies" frequently.

Defense counsel presented an expert witness, Dr. Mohammed Amin Kholwadia, who is an educator and religious leader in the

Muslim community in Chicago and has substantial experience working with Arabic-speaking students learning English. Dr. Kholwadia interviewed defendant and reviewed his test scores along with other materials. Dr. Kholwadia expressed the opinion that defendant had poor English skills compared to other Arabic-speaking students who had been in this country for a time. Dr. Kholwadia found it more difficult to explain legal concepts to defendant than to most students.

Of course, the best evidence of defendant's fluency in English at the time of the interview is the videotape of the interview itself. My impression from multiple reviews of that videotape is that defendant had a fair ability to converse with the detectives in English. Although he did frequently respond "Huh?" to questions and had trouble with certain words (e.g., "statement," "hollering," "forged," "sacrilege," "voluntary"), he responded appropriately to most of the questions posed to him. His spoken English is somewhat broken and difficult to understand but, as the witnesses testified, adequate for a casual conversation.

### III. DEFENDANT'S UNDERSTANDING OF THE ADVISEMENT

Approximately three minutes into the interview, after introductions and obtaining basic information about defendant's identity, Detective Martinez read defendant his *Miranda* rights from Exhibit 1. This was introduced by "I've gotta go over some paperwork before we start talking here, ok?" Detective Martinez read the four rights at once, without pausing or offering any additional explanation, and then asked defendant if he understood. Defendant nodded and mumbled something that sounds like an affirmative response. Detective Martinez asked him if he was sure, and defendant said yes. This entire advisement consumed approximately 18 seconds. The form was not turned so defendant could read along. Detective Martinez checked off each of the rights as he read it but did not have defendant initial each right. Detective Martinez wrote defendant's answer (yes) when he said he understood. Detective Martinez then turned the form to defendant and told him, "I need your signature here to show you were the person advised of your rights." Defendant signed his name without reading anything. Detective Martinez then said, "It says here, 'knowing my rights and knowing what I am doing, I now wish to voluntarily talk to you.' To talk with us, I need your signature on that line." He pointed to the signature blank in the waiver portion of Exhibit 1; defendant looked at the bottom portion of the form for a few seconds and then signed his name again. Defendant asked no questions about the advisement.

Detective Martinez did not use the police department's video advisement form but did ask defendant if any promises or threats had been made to get him to make this statement, which defendant did not seem to understand. When this question was repeated, defendant said, "What's a statement?" Defendant ultimately agreed that no promises or threats had been made, that he was not under the influence of drugs or alcohol, that he was making the statement voluntarily, and that he understood that it was being videotaped. In the midst of this portion of the advisement, defendant stated for the first time that he was not going to talk until the victim's uncle comes. The interview then proceeded.

At no point during the first interview was defendant asked about his understanding of English or whether he wanted an interpreter. Neither Detective Martinez nor Detective Guigli considered looking for an interpreter. Detective Martinez testified that defendant's English was "perfectly fine;" in fact he said he did not know if English is defendant's first language. This I found to be incredible. Defendant's name, appearance and thick accent should have alerted anyone that he was not a native speaker of English. Detective Guigli did know defendant was from Saudi Arabia and had spoken to defendant's brother and members of the victim's family. He had not asked anyone about defendant's fluency in English.

There is a marked contrast between the first interview and the second *Miranda* advisement done that afternoon by Detective

Vigil. Detective Vigil began by asking defendant how long he had been in this country, where he had gone to school, if defendant understood him and if defendant had understood everything that morning. Defendant answered "Uh-huh" and added that he sometimes has a problem understanding but agreed to ask for an explanation if he did not understand. Detective Vigil then read each right separately and offered some explanation or paraphrase and asked defendant if he understood after each right. Defendant said he understood. When Detective Vigil made clear that defendant could have a lawyer sitting with him in the interview, defendant immediately said, "I want a lawyer." The interview then terminated.

Three expert witnesses viewed the videotape and the advisement form and expressed their opinions that defendant did not understand the rights or the consequences of his waiver. Ms. Hind was qualified as an expert in assessing and teaching students of English as a foreign language. Based on her expertise and her experience with defendant as a student at Spring, she expressed the opinion that there was a chance that defendant understood the rights but she believed he would have difficulty reading the form and particular difficulty understanding the rights given his cultural background. She pointed out that the passive voice used in the second right can be confusing to foreign students and that the conditional construction of the fourth right can also be confusing. She believed defendant did not have time to read the form and that his nodding did not necessarily indicate an understanding. I found Ms. Hind, who was called by the prosecution, to be credible and knowledgeable, although her objectivity is somewhat tempered by her description of herself as "almost like an aunt" to defendant and his brother.

Dr. Kholwadia was qualified as an expert in the Arabic language, Islamic law and Saudi Arabian culture. He also had substantial experience in dealing with Arabic students of English in the United States. He had not previously testified as an expert, and I found him to be thoughtful, credible and extraordinarily well credentialed. He expressed the firm opinion that defendant did not understand the rights read to him or the concept of waiving those rights. This was based partly on defendant's difficulty with English and the manner in which the rights were read. Dr. Kholwadia added important explanations of the cultural background of a Saudi Arabian student that would affect his understanding. For example, he said that nodding is very cultural and does not necessarily mean that an Arab person understands everything but can mean that he wants more explanation. He also observed that the concept of having the option not to talk to police authorities was foreign to defendant, as it would be to most Saudis, since refusal to talk to the police in Saudi Arabia is not an option. He opined that some of the terms used in the advisement such as "right" and "evidence" could translate into two or three different meanings. While "lawyer" translates accurately, in Saudi Arabia, most lawyers deal with commercial law and are not frequent fixtures in criminal cases. Dr. Kholwadia went over the advisement form with the defendant the day he testified, trying to explain it to him. He said that defendant now understands the words but still has trouble with the concept of the right to remain silent.

Likewise, Professor Slakey viewed the videotape and the advisement form and expressed the opinion that defendant could not have understood the advisement. Professor Slakey analyzed the language of Exhibit 1 by applying a standard formula to it to produce a "readability level." This formula apparently measures the length of sentences and words used, and it scored the form as requiring seventh grade reading level for a native speaker, which does not account for cultural differences. He compared this to the fifth grade level at which defendant was reading English when he left Professor Slakey's school. He described the second advisement, done by Detective Vigil, as having an "entirely different flavor" where the detective used techniques to ensure defendant's comprehension similar to techniques used by teachers of English to foreign students. Since Professor Slakey testified by telephone, his credibility could not be assessed fully, but his opinions made sense and his experience teaching defendant was a valuable perspective.

Finally, the two friends of defendant who testified and reviewed the advisement form both expressed the opinion that, based on their experience with defendant's ability in English and dealing with school forms, he could not have understood the rights on that form. In particular, Ms. Kirk said that defendant could follow the words of the *Miranda* rights but was unlikely to grasp the real meaning without explanation.

## IV. DEFENDANT'S REQUESTS TO SPEAK TO THE VICTIM'S UNCLE

Early in the first interview, defendant said he was not going to talk until the victim's uncle comes. Detective Guigli said in response, "You understand we have to talk first," to which defendant replied, "We'll talk." Minutes later, defendant said, "I don't feel like talking until his uncle comes." Detective Guigli's response was, "We can't bring the uncle into this interview." Defendant then continued to answer questions. In addition to these requests to speak to the victim's uncle, defendant made requests prior to the interview to make phone calls to various people, all of which Detective Guigli denied.

Defendant stated that he was good friends with the victim and that his father and the victim's father worked for the same company in Saudi Arabia. He claimed to have spoken to the victim's uncle about the story his two roommates were telling (blaming defendant for the murder) and had agreed to tell the uncle everything when he came to Colorado. Defendant said his understanding was that in Saudi Arabia, all three of them might be beheaded, but that it was up to the parents of the victim to say what the punishment should be. Later, towards the end of the interview, the detectives explained that in this country, the case would be decided by a judge and jury, not the victim's parents. Defendant felt that he would not go to prison and asked the detectives what would happen if the uncle said he should be let go. Throughout the interview, defendant seemed eager to show the detectives where the body had been dumped.

Dr. Kholwadia observed that, in the Saudi justice system, the views and feelings of the victim's family are of great importance and that this may have explained why defendant was so eager to speak to a member of the victim's family. Questions from the detectives also implied to defendant that it would be very important to the victim's family, for religious reasons, to retrieve the body for a proper burial. Other than these requests to speak to the victim's uncle, defendant made no other efforts to stop the interview. On the videotape, he did not appear to be unusually tired, stressed or intimidated by the detectives.

## V. POLICE METHODS OF INTERROGATION

Defendant complains that his statement should be found to be involuntary due to several forms of coercion or improper techniques used by the detectives.

First, he makes reference to the fact that he was in a rollover car accident in New Mexico the day before the interview, and that this was known to Detective Guigli. However, there was no evidence offered at the hearing, and none is apparent on the videotape, that defendant was injured in this accident or was suffering ill effects from it at the time of the interview.

Second, defendant alludes to the fact that he had traveled all night on a bus from Albuquerque. However, there was no testimony about how much defendant slept during the ride, and he did not appear to be exhausted or sleep-deprived during the interview.

Third, defendant complains that the presence of three armed detectives with him in a small interview room was intimidating and coercive. Again, the videotape is the best evidence of defendant's apparently calm demeanor and lack of fear or demonstrated intimidation. While, at times, the questioning became aggressive, accusatory, and even badgering, the videotape does not show the defendant's will was overborne by these tactics. Defendant once said the detectives were "pissing him off," but he remained composed throughout the interrogation.

Fourth, defendant complains that the detectives misused references to the Koran and Islamic beliefs to elicit his statements. Again, the videotape does not show that these techniques were particularly effective or coercive to this suspect. In fact, Dr. Kholwadia testified that defendant was not a particularly religious person. Therefore, these references presumably had less impact upon him than they might have on a particularly devout Muslim.

Finally, the videotape does not convince me that the refusals by the detectives to allow defendant to make telephone calls or to speak to the victim's uncle before speaking to them necessarily put defendant in fear or coerced his answers to their questions.

## VI. CONCLUSIONS OF LAW

Under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), a suspect in police custody must be advised of his rights prior to questioning. A defendant may choose to waive his rights to remain silent or have a lawyer present during questioning. The validity of the defendant's waiver involves a two-part inquiry. The waiver must have been made: (1) voluntarily, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception;" and (2) the waiver must have been made knowingly and intelligently. *Colorado v. Spring*, 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). The prosecution has the burden of proving by a preponderance of the evidence that the defendant's waiver was both voluntary and knowing and intelligent. *People v. Jiminez*, 863 P.2d 981 (Colo.1993). The validity of the waiver must be assessed based on the totality of the circumstances surrounding the custodial interrogation. *Jiminez*, 863 P.2d at 984.

On the first prong of this inquiry, considering the totality of the circumstances, I find and conclude that defendant's waiver was voluntary in the sense that it was not the product of intimidation, coercion or deception by the detectives. My conclusions below on the related question of the voluntariness of

defendant's statement support this conclusion.

However, based on the totality of the circumstances, I find and conclude that the People have failed to sustain their burden of proving by a preponderance of the evidence that defendant made a knowing and intelligent waiver of his *Miranda* rights. To find a knowing and intelligent waiver, I would have to be convinced by a preponderance of the evidence that defendant was "fully aware of the nature of the right to remain silent ... and the consequences of abandoning that right." *People v. Kaiser*, 32 P.3d 480 (Colo. 2001), citing *Jiminez*, 863 P.2d at 984. The evidence here does not support such a finding.

In reaching this conclusion, I have considered the applicable factors listed by the Supreme Court in *Kaiser* as well as other factors unique to this case.

1. The time interval between the advisement and the subsequent interrogation was very brief.

2. The detectives initiated the interview, although the defendant had earlier expressed some eagerness to talk with the detectives.

3. There was no effort to remind defendant of his rights or give a fuller explanation of them during the course of the interrogation.

4. Defendant's acknowledgment of the rights and his waiver were so perfunctory as to be meaningless for a person with defendant's background. The advisement was cursory, at best. The rights were read in a matter of seconds, and defendant was not even given the opportunity to read along with Detective Martinez. Unlike Detective Vigil, Detective Martinez did not stop after each right and paraphrase or ask a question to make sure defendant understood. Further, Detective Martinez derogated the importance of the rights by putting them in the context of "getting some paperwork out of the way." Detective Martinez made no effort to have the defendant initial each of the rights, and his having defendant sign the form in two places was done in

▮▮

a manner that made it appear to the defendant that he had no choice but to sign.

5. The interview demonstrates defendant did not understand that he had the right to remain silent when defendant twice says he wants to talk to the victim's uncle first. This was obviously important to defendant, apparently for cultural and family reasons. If defendant had appreciated that he had an absolute right not to talk with the detectives, he would have insisted on waiting for the uncle to arrive. Instead, he kept talking when his requests were denied.

6. The definitive demonstration that defendant did not understand the rights the first time around is his reaction when the rights were properly explained to him by Detective Vigil. He immediately stated that he wanted a lawyer. Although some time had passed between the first advisement and the second advisement, that does not explain how defendant had such a different reaction to hearing the same rights.

7. Although defendant could converse in English, his abilities, according to his peers and the expert witnesses, were limited. As demonstrated in Detective Vigil's advisement, he had sufficient ability in English that he could have been advised in a manner that he would have understood, and he could have had the opportunity to make an intelligent choice. However, that was not done.

8. Defendant's cultural background as a citizen of Saudi Arabia made it impossible for him to understand and absorb the *Miranda* warning without further explanation or elaboration. Defendant had no prior experience with the American system of criminal justice and no grasp of the right of a suspect to refuse to answer police questioning. His expectations about the controlling influence the victim's family would have on the process show his profound lack of understanding of criminal justice in the United States. His spending time watching "gangster movies" is not a substitute for an understandable advisement.

9. Defendant's age, experience, education, and background have all been considered as described in the factors above. He displayed no lack of intelligence that would have impeded his understanding of an effective explanation of his rights.

Several Colorado cases have found waivers of *Miranda* rights to be ineffective when the suspect's understanding was impeded by language or cognitive difficulties. *People v. Mejia–Mendoza*, 965 P.2d 777 (Colo.1998)(Spanish interpreter failed to translate rights correctly); *People v. Jiminez*, 863 P.2d 981 (Colo.1993)(defendant given rights in Spanish but spoke Kickapoo); *People v. May*, 859 P.2d 879 (Colo.1993)(defendant was in hospital, groggy and barely conscious when advised). Other cases have rejected such claims. *People v. Kaiser, supra.* (developmentally delayed suspect knowingly waived rights after two careful advisements); *People v. Jordan*, 891 P.2d 1010 (Colo.1995)(court rejected psychiatrist opinion that suspect did not understand where advisement was not perfunctory and suspect had prior criminal justice experience).

None of those cases precisely fits the facts here. The distinguishing factors here are the perfunctory nature of the advisement, defendant's demonstrated lack of understanding of his rights and his invocation of the rights when properly advised later. As long as our jurisprudence imposes an obligation on law enforcement to advise suspects of their rights before a custodial investigation, that advisement must be done in a way that affords the particular suspect a meaningful opportunity to understand and exercise his rights. If the type of advisement given here is found to be sufficient, the advisement requirement becomes a sham.

Defendant's second contention is that the statement was involuntary and resulted from improper interrogation techniques. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'

within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Police coercion includes not only physical abuse or threats directed at a person but also subtle forms of psychological coercion. *People v. Gennings,* 808 P.2d 839, 843–44 (Colo.1991). "Critical to any finding of involuntariness is the existence of coercive governmental conduct, either physical or mental, that plays a significant role in inducing a confession or an inculpatory statement ... [T]he deliberate exploitation of a person's weaknesses by psychological intimidation can, under certain circumstances, constitute coercion rendering a statement involuntary." *People v. Valdez,* 969 P.2d 208, 211 (Colo.1998). In determining whether a confession is involuntary, the inquiry is whether defendant's will was overborne by physically or mentally coercive governmental conduct. *Id.*

The factors I have considered in finding defendant's statement to be voluntary are, as mandated by *Gennings,* the following:

1. Defendant was in custody.

2. Defendant was not free to leave.

3. From the videotape, it is clear that defendant was fully aware of the situation. Although he initially asked the arresting detectives what was going on and where they were taking him, he was told early in the interview that this was a homicide investigation, and he knew the police were investigating the disappearance of his friend.

4. *Miranda* rights were read to defendant, although not in a manner calculated to make sure he understood them.

5. As I conclude above, defendant did not fully understand his *Miranda* rights or knowingly waive them, although he said he did.

6. Defendant did not have the opportunity to confer with counsel prior to the interrogation. Although he asked to speak to his brother, the victim's uncle and others, these requests were denied.

7. The statements were made during the interrogation, although defendant attempted to volunteer information even before he arrived at headquarters.

8. No threats were made by the detectives, nor were there any overt promises. By pressing defendant to "help himself" by telling the whole story, the detectives may have implied that defendant would receive leniency in return for his cooperation, but this did not play a significant role in eliciting defendant's incriminating statements. See *People v. Wickham,* —— P.3d ——, 2001 WL 1477915 (Colo. App. No. 99CA2087, Nov. 23, 2001). Encouraging a suspect to tell the truth is not coercion. *People v. Miranda–Olivas,* 41 P.3d 658 (2001).

9. The method or style of the interrogation did not overbear defendant's free will. Although the detectives occasionally used a demanding or accusatory tone and other "tactics" designed to elicit truthful information, none of the tactics used was coercive or improper.

10. Defendant's mental and physical condition just prior to the interrogation was apparently acceptable. He showed no ill effects from his recent car accident and seemed alert and focussed.

11. The interview was completed in 90 minutes, not an oppressively long time for a homicide case.

12. The location of the interrogation was a standard video interview room. Although the room is small and was crowded with three detectives, the detectives at no time employed their physical presence or bulk to intimidate defendant.

13. The physical conditions in the interrogation room were unremarkable. Defendant was having a drink during the first portion of the interview and did not appear to be uncomfortable.

An additional factor is that defendant had sufficient presence of mind initially to deny any knowledge of the victim's whereabouts.

Only after further questioning did he begin to admit his knowledge and involvement. *See People v. Stephenson,* — P.3d —, 2001 WL 1477914 (Colo.App. No. 99CA0484, Nov. 23, 2001); *People v. Jordan,* 891 P.2d 1010 (Colo.1995).

In sum, from the totality of the circumstances present here, particularly defendant's demeanor and statements shown on the videotape, I conclude that defendant gave his statement voluntarily and that his will was not overborne by any threats, coercion or tactics employed by the detectives.

On defendant's third argument, I find and conclude that defendant did not clearly articulate his desire to remain silent ·so that a reasonable police officer would understand that he was asserting his *Miranda* right to cut off questioning. *People v. Arroya,* 988 P.2d 1124 (Colo.1999). Of course, since I have concluded that defendant did not appreciate that he had the right to remain silent, it is problematic to analyze whether he clearly articulated an exercise of this right. My conclusion here is, assuming that defendant knew his rights, he did not clearly articulate an intent to exercise the right to terminate questioning.

In *Arroya,* the Supreme Court lists the wide range of factors that must be reviewed in considering the totality of the circumstances on this issue. The factors I have considered are as follows:

1. Defendant's repeated requests to speak to the uncle were, at best, conditional requests, and he willingly and quickly resumed answering questions after his requests were denied.

2. Defendant's limited fluency in English is described above. He had sufficient speaking ability to clearly articulate a demand that questioning stop. The speech patterns and behavior of the defendant before and after the requests did not suggest that he was refusing to talk further.

3. The content of the interrogation, particularly defendant's responses to questions about the feelings of the victim's family, made his desire to see the uncle understandable in a way that did not constitute a "clear articulation" that he wanted all questioning to stop.

4. The demeanor and tone of the officers at the times of these requests was not nasty or overbearing.

5. The requests were made early in the interview.

6. Two detectives and defendant were present at the time of these requests.

7. Defendant had no prior contact with the criminal justice system, and he did not understand that he had the right to remain silent.

8. The detectives did not attempt to clarify defendant's request but did offer explanations as to why his request could not be honored at that time, and those explanations seemed to satisfy defendant.

Because defendant did not knowingly and intelligently waive his rights, the motion to suppress his statements to Detectives Guigli, Martinez and Schneider is granted.

SO ORDERED.

Dated this day 20th of December 2001.

BY THE COURT:

/s/ Joseph E. Meyer III
Joseph E. Meyer III
District Court Judge

cc: DA Michael Pellow
    ATD Gary Lozow