**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

**v.**

**Andrea HUMPHREY, Defendant–**
**Appellee.**

No. 05SA364.

Supreme Court of Colorado,
En Banc.

April 17, 2006.

Carol Chambers, District Attorney, Daniel Plattner, Deputy District Attorney, Centennial, for Plaintiff–Appellant.

David S. Kaplan, Colorado State Public Defender, Gina K. Shimeall, Deputy State Public Defender, Daniel B. King, Deputy State Public Defender, Englewood, for Defendant–Appellee.

MARTINEZ, Justice.

The People bring this interlocutory appeal challenging the trial court's suppression of statements made by the Defendant, Andrea Humphrey, during a custodial interrogation

by a police officer. The trial court found the statements were both involuntary and made pursuant to an invalid waiver of Humphrey's rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The People contend that the trial court erred as a matter of law and lacked a factual basis for its judgment. We agree with the People in part. Consequently, we reverse the ruling of the trial court in part and affirm in part.

## I. Facts and Proceedings Below

On February 26, 2005, Aurora police officers, Luke Mossburgh and Anthony Guzman, responded to a call involving an assault at a residence on South Salem Street. The officers were advised that a male had been stabbed by a female who then left the scene. When the officers arrived at approximately 1:00 a.m., they found Defendant, Andrea Humphrey, a few blocks from the location of the dispatch. Humphrey was bleeding, incoherent, and in need of medical attention. After ascertaining that Humphrey was unarmed, the officers asked her several questions about what had transpired and proceeded to call for an ambulance. A trail of blood was later traced from Humphrey's location back to the Salem Street residence where the victim, Jason Johnson, was found dead from a single stab wound to the chest.

Humphrey was taken to a hospital where her injuries were treated. Humphrey was not asked any questions or interrogated en route to the hospital. At the hospital, she consented to a blood draw after receiving medical attention. She also answered basic biographical questions posed by Detective Hershel Stowell. After a four or four and a half hour hospital stay, she was released to Officer Mossburgh for transport to Aurora Police headquarters.

Blood alcohol tests revealed that Humphrey had blood alcohol levels of 0.104 at 3:24 a.m. and 0.090 at 4:27 a.m. The physician who treated Humphrey noted in his report, however, that Humphrey was "clinically sober" upon release from the hospital.

After being transported to the station, Humphrey was taken to an interview room for questioning at around 6:00 a.m. Detective Stowell conducted a custodial interrogation and Detective Tom Welton observed. Both officers were dressed in casual attire and were unarmed. Detective Stowell told Humphrey that "the interrogation was to get her side of the story."

At the time of the interview, Humphrey had not slept for over a day and appeared exhausted. Detective Stowell testified, however, that Humphrey did not appear intoxicated, did not slur her speech, did not smell of alcohol, and was responsive to interview questions. She was "more aware" than she had been previously.

Detective Stowell advised Humphrey of her *Miranda* rights. When Detective Stowell read each of the five advisement statements to Humphrey, she remained silent when asked if she understood each individual right, but did initial each advisement as Detective Stowell went over the advisement form. She also had an opportunity to read the form and signed it, acknowledging that she understood her rights as a whole. Finally, Humphrey verbally affirmed that she understood all of the rights previously read to her and indicated that she was willing to speak with Detective Stowell.

The custodial interrogation lasted over two hours. During that time, Humphrey was responsive to questions and did not appear confused or intoxicated. The interrogation was recorded on both video and audio tape. At no point during the interview did Humphrey request legal representation or indicate that she did not understand the nature of the rights she had waived.

Late in the interrogation, Detective Stowell informed Humphrey that the victim died. This was the first time Humphrey had been made aware of his death. She reacted strongly, collapsing into tears and hysterics. Her answers to further questions were partially incoherent.

Humphrey was charged with first degree murder and felony menacing. She moved the trial court to suppress the statements made when approached by the officers on the street. The motion was denied. Humphrey next moved the court to suppress the statements she made during the interrogation at the station. The parties did not dispute that Humphrey was in custody at the time of the

interrogation, only whether Humphrey's statements were made voluntarily and whether her waiver of her *Miranda* rights was made voluntarily, knowingly, and intelligently. Following an evidentiary hearing, the trial court granted Humphrey's motion to suppress. The People bring this interlocutory appeal challenging the decision of the trial court.

## II. Trial Court Findings

In granting the defendant's motion, the trial court found Humphrey's statements following the disclosure of the victim's death were involuntary, and her waiver was invalid given the circumstances surrounding her interrogation. The court noted a number of factors in its decision:

(1) Humphrey's experience and exposure to the criminal justice system were minimal. She had no prior arrests, was unfamiliar with the proceedings, and had no friends or family present to assist her before or during the interrogation. The court was troubled that Humphrey "was told only that the interrogation was to get 'her side of the story,'" and that this suggested "her statement was in her behalf and not inculpatory." Although Humphrey was aware of the subject matter of the investigation, she was not informed at the time of her *Miranda* advisement and waiver that she was being investigated for murder. The court found that only after learning of the victim's death did she "realize the gravity of the situation."

(2) The court noted Humphrey's age, education level, and background. At the time of her arrest, she was 19, a high school graduate, and employed.

(3) The court emphasized Humphrey's physical and emotional state at the time of the interrogation. The court noted that she "did not appear to be under the influence of alcohol," but nonetheless inferred from her earlier intoxication and blood alcohol levels that Humphrey remained impaired by alcohol. The court also considered the physical, emotional, and psychological trauma Humphrey had experienced earlier in the evening. She sustained significant injuries about her head and face from being beaten and having her head hit a counter. The court also noted her apparent exhaustion, lack of sleep, slumped posture, and the dull affect exhibited during the interrogation. However, the court also noted factors suggesting Humphrey was alert and coherent. Humphrey was able to answer questions, drew a diagram of the kitchen, and did not slur her speech when answering questions. She also "withstood constant repetition of the same questions from the officer without apparent irritation or resentment for a period of almost two hours."

(4) The court considered other factors which adversely affected Humphrey's emotional state, such as the fact that she was in custody, the length of the interrogation, her earlier hospitalization, and her distress over her car being taken without her permission.

(5) Finally, the court found the interrogation by Detective Stowell following the disclosure of the victim's death psychologically coercive. In this "post-disclosure" period, the trial court found these interrogation techniques "argumentative and suggestive of answers, mischaracterizing what the Defendant had previously said."

Taking these circumstances into account, the trial court found the prosecution failed to establish by a preponderance of the evidence that Humphrey made a knowing, voluntary, and intelligent waiver of her *Miranda* rights, or that Humphrey's statements following the disclosure of the victim's death were voluntary.

Because the trial court placed significant emphasis on the psychological coercion and emotional vulnerability of Humphrey following the disclosure of the victim's death, we address the *Miranda* waiver and the voluntariness issue first with respect to the pre-disclosure period of the interrogation and then to the post-disclosure period. We reverse the trial court's determinations on both the *Miranda* waiver and the voluntariness issue with respect to the pre-disclosure period of the interrogation. Because we ultimately affirm the trial court's voluntariness determination with respect to the post-disclosure period of the interrogation, we do not find it necessary to address the *Miranda* waiver further.

## III. Defendant's *Miranda* Waiver

In reviewing the trial court's determination of the validity of a *Miranda* waiver, we defer to the trial court's resolution of disputed facts "when the resolution is supported by competent evidence in the record." *People v. Al–Yousif,* 49 P.3d 1165, 1169 (Colo. 2002). Purely factual determinations by the trial court are accorded due deference. *Id.* However, the application of the legal standard to those facts is a question we review de novo. *Id.*

In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court established certain guidelines to safeguard the due process rights of a suspect during a custodial interrogation. *See People v. May,* 859 P.2d 879, 882 (Colo.1993). These rights may be waived provided the waiver is made knowingly, voluntarily, and intelligently. *Id.* The validity of a defendant's waiver turns upon two elements: (1) voluntariness, that is, whether the waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) knowing and intelligent action, that is, whether the defendant was fully aware "both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 882–83 (internal citations omitted); *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). This two-pronged inquiry looks to the totality of the circumstances. *See People v. Mejia–Mendoza,* 965 P.2d 777, 780 (Colo.1998).

In *People v. Chase,* 719 P.2d 718, 721 (Colo.1986), this court noted a number of non-exclusive factors to consider as part of those circumstances. These include: (1) the lapse of time between an initial *Miranda* advisement and a subsequent interrogation, (2) the extent to which a suspect has been informed or is aware of the subject matter of the interrogation prior to its commencement, (3) whether the accused or the interrogating officer initiated the interview, (4) whether and to what extent the accused was reminded of his rights prior to the interrogation, (5) the clarity and form of the defendant's acknowledgement and waiver, if any, and (6) the background and experience of the accused in connection with the criminal justice system. *Id.* (quotations omitted). *See also People v. Kaiser,* 32 P.3d 480, 484 (Colo. 2001); *People v. Hopkins,* 774 P.2d 849, 852 (Colo.1989). Other factors such as the defendant's language comprehension, age, experience, education, background, and intelligence are also appropriately taken into account. *Kaiser,* 32 P.3d at 484 (citations omitted). While no one of these factors is determinative, they are appropriate to consider when evaluating whether "the defendant was sufficiently aware of the continuing nature of his constitutional rights as to render any subsequent statement the result of a knowing, intelligent, and voluntary waiver of those rights." *Chase,* 719 P.2d at 721.

There are also factors which the court is expressly directed to discount or deem irrelevant. For instance, it is not incumbent upon officers to inform a suspect of the subject matter of an investigation. *Colorado v. Spring,* 479 U.S. 564, 577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). Not only is such a requirement beyond the scope of *Miranda,* "a suspect's awareness of all possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Id.* Similarly, officers are not obligated "to tell a suspect all the facts and circumstances which might affect the suspect's decision whether to waive his rights." *People v. Pease,* 934 P.2d 1374, 1378 (Colo.1997).

Again, in evaluating the validity of a waiver, we engage in a two-part inquiry. First, we consider whether the waiver was made voluntarily. *See May,* 859 P.2d at 882. Second, we consider whether the waiver was made knowingly and intelligently. *Id.* The defendant must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.; Burbine,* 475 U.S. at 421, 106 S.Ct. 1135. *See also Hopkins,* 774 P.2d at 851. This inquiry does not concern the wisdom of a defendant's decision to waive their *Miranda* rights, rather it concerns whether the defendant sufficiently comprehended the waiver itself. *See Burbine,* 475 U.S. at 421,

106 S.Ct. 1135. The burden of proof rests upon the prosecution to prove by a preponderance of the evidence that the waiver was valid. ·Colorado v. Connelly, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Burbine, 475 U.S. at 421, 106 S.Ct. 1135; Hopkins, 774 P.2d at 852.

## A.

■ The first prong of the waiver validity inquiry concerns whether the waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." See Burbine, 475 U.S. at 421, 106 S.Ct. 1135; May, 859 P.2d at 882. Following Connelly, the sole concern here is the presence or absence of government coercion. See Connelly, 479 U.S. at 170, 107 S.Ct. 515. Accordingly, we look to the government's actions with respect to the defendant's Miranda waiver to determine whether the waiver was made voluntarily or whether it was the product of official coercion or compulsion. See id.

■ Initially, we note that the trial court's findings on the issue of government coercion are inconsistent. The court stated:

> At the interrogation the Defendant responded to the questions asked with apparent understanding and was apparently competent to understand the questions. *She was aware of the subject matter of the interrogation. There is no evidence that she was threatened or forced into waiving her Constitutional rights.*
>
> She did not ask for a lawyer or ask to stop the questioning at any time during the interrogation. She appeared injured, but was apparently able to understand her rights and to relate events . . . .

(Emphasis added). Although the court explicitly found "no evidence that she was threatened or forced into waiving her Constitutional rights," the court nonetheless went on to hold that Humphrey's statements were involuntary.

The trial court's holding is somewhat unclear as to why it found the government's actions coercive. The court primarily addressed the defendant's physical and emotional circumstances:

> It was apparent from the questioning that only [after defendant was told of the victim's death] did she realize the gravity of the situation, and it is apparent from the film—the DVD of the questioning of the Defendant that the persistent questioning of the Defendant by the investigator after her emotional breakdown was, under all the circumstances including[:] her age; her being in custody; her lack of any previous involvement in the criminal justice system—a significant previous involvement; the undergoing of lengthy questioning after having earlier been traumatized and beaten about the head and face[;] having her head slammed into a counter; having her car taken away without her permission; undergoing emotional and verbal abuse from Jason throughout the day and evening; being earlier intoxicated; and having gone through the entire previous day and the morning without any sleep, psychologically coercive.

In its discussion of the facts, however, the trial court noted considerations pertaining to the government's conduct: "the Defendant was not informed prior to her advisement of rights or during the advisement of her rights that she was being investigated for the crime of murder," "the Defendant was only told . . . 'the interrogation was to get [her] side of the story,' [a]nd no other purpose of the questioning was disclosed to the Defendant," "the investigating officer did not explain the terms to her and did not explain her rights, except to say that she could 'decide at any time to exercise her rights and not answer any questions,"' and the tone of questioning changed following the disclosure of the victim's death, and thereafter the interrogation became "argumentative and suggestive of answers, mischaracterizing what the Defendant had previously said." From these observations, it appears there were two main considerations before the court which supported the conclusion that the government actions were coercive: (1) alleged inadequacy of the Miranda advisement, and (2) the nature of the interrogation techniques following the disclosure of the victim's death. We address these in turn.

### i.

The trial court was troubled by Humphrey's inexperience with the criminal justice system and Detective Stowell's explanation that the interrogation was to "get her side of the story." Because she was unaware of the victim's death, the court implies Humphrey did not understand the context of the interrogation or her rights entering into that interrogation. The court noted that although Humphrey's education and experience implied that she understood the terms in the advisement form, "the investigating officer did not explain the terms to her and did not explain her rights, except to say that she could 'decide at any time to exercise her rights and not answer any questions."' The court also noted that Humphrey did not respond when asked if she understood this explanation. Taking these details into account along with Humphrey's unfamiliarity with police proceedings and apparent failure to grasp the gravitas of her situation, the court implies the *Miranda* warning was inadequate.

The trial court's conclusion rests upon an erroneous view of the officer's obligation to a suspect under *Miranda*. Under *Miranda*, an officer is obligated to ensure that a suspect is aware of and understands their constitutional rights. *See Pease*, 934 P.2d at 1378. Officers have no obligation to inform a suspect of the possible subjects of an interrogation or the facts and circumstances which may be pertinent to his or her decision to talk to police. *See id.; see also People v. Jordan*, 891 P.2d 1010, 1015–16 (Colo.1995). Accordingly, the only question that concerns us here is whether the *Miranda* advisement was sufficient or if more was needed, that is, whether Detective Stowell ensured that Humphrey was aware of and understood her constitutional rights.

Here, Detective Stowell went through each advisement verbally and provided Humphrey with a "simple form" that the trial court found "very clear." Humphrey initialed each statement and indicated both in writing and verbally that she understood her rights as a whole. The court acknowledged that Humphrey's education level led to the inference that she was able to read and comprehend the advisement. The court also noted that Humphrey was "apparently able to understand her rights" and "readily acknowledged that she understood what was being said when the rights were read to her by the officer."

While an officer is obligated to ensure that a suspect is aware of and understands their constitutional rights, Detective Stowell was under no obligation to provide a lengthier explanation of Humphrey's rights or the consequences of waiving those rights where Humphrey's responses clearly indicated that she understood the advisement. Humphrey's silence when asked if she understood each individual question was not a sufficient indication that she failed to grasp the meaning of the *Miranda* advisements given the overwhelming indications to the contrary.

Furthermore, the court's focus on Humphrey's ignorance of the victim's death and the attendant gravity of that circumstance is simply irrelevant to the officer's *Miranda* obligations. Humphrey's knowledge of these circumstances bears no relation to her ability to comprehend her constitutional rights. While such knowledge would factor into the defendant's decision to waive those rights, this is not a concern facing the interrogating officer. *See Pease*, 934 P.2d at 1378. Accordingly, we find no wrongdoing on the part of Detective Stowell in failing to disclose the victim's death or the nature of the charges Humphrey was facing when he advised her of her rights under *Miranda*.

Last, Detective Stowell's statement suggesting the purpose of the interrogation was to get Humphrey's side of the story was not so misleading as to constitute the kind of intimidation, misconduct, or trickery that has been found to violate *Miranda*. *See, e.g., Burbine*, 475 U.S. at 412, 106 S.Ct. 1135 (failure to inform suspect that his sister had arranged for an attorney and that attorney had telephoned police station did not invalidate waiver); *Pease*, 934 P.2d at 1379 (failure to inform defendant of arrest warrant is not deception, trickery, or coercion prohibited by *Miranda*); *People v. Gray*, 975 P.2d 1124, 1128 (Colo.App.1997) (waiver was not involuntary where detectives did not reveal strength of their evidence when the interro-

gation commenced and where suspect showed signs of physical discomfort during interview). Although Detective Stowell's comment was not entirely benign, it did not so taint the advisement as to render it coercive under the circumstances. Accordingly, we conclude that Humphrey's *Miranda* advisement was adequate and there was no misconduct on the part of the government in advising her of her rights or securing the waiver.

### ii.

The trial court found Detective Stowell's interrogation of Humphrey following the disclosure of the victim's death psychologically coercive. Although we will address this finding in greater detail in Part IV, here it is sufficient to note that this finding does not affect whether Humphrey's waiver was coerced or voluntary in the period of the interrogation preceding the disclosure of the victim's death.

The pre-disclosure statements are valid as the trial court found no coercive conduct during this portion of the interrogation. This is especially apparent in light of the court's findings that there was "no evidence that she was threatened or forced into waiving her Constitutional rights," she "was apparently able to understand her rights and to relate events," and "readily acknowledged that she understood what was being said when the rights were read to her by the officer."

Because we affirm the trial court's determination that the post-disclosure statements were involuntary in Part IV, our *Miranda* analysis need not extend to the post-disclosure period.

### B.

In turning to the second prong of the inquiry, we consider whether the waiver was made knowingly and intelligently. *May*, 859 P.2d at 883. "[T]he waiver must have been made with a full awareness, both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421, 106 S.Ct. 1135; *see May*, 859 P.2d at 882; *Hopkins*, 774 P.2d at 851.

Again, a number of the trial court's findings are inconsistent. On the one hand, the court observed that Humphrey appeared to understand her rights. The court inferred that she was able to read the advisement and found Humphrey "readily acknowledged that she understood what was being said when the rights were read to her by the officer." The court also found that up until the time the victim's death was disclosed, defendant appeared "able to participate" and her answers were "responsive" and "the product of rational thought."

Despite these observations, the trial court then discounted Humphrey's cognizance of her constitutional rights entirely. The court discussed Humphrey's state at the time of the waiver in detail, noting her education, background, emotional state, physical state, and unfamiliarity with criminal justice procedures. The court also inferred that "she remained impaired to some degree by alcohol," and noted her apparent exhaustion, sleep-deprivation, and dull affect. The court found these circumstances prevented Humphrey from making a rational, informed decision.

The court's analysis failed to reconcile its conflicting observations, and again focused on Humphrey's understanding of "her situation" and the context of the interrogation, rather than her understanding of her constitutional rights and the consequences of abandoning those rights:

> The Defendant at the time of the waiver of her rights had been previously subjected to prolonged physical and emotional and verbal abuse and trauma. She had been intoxicated earlier in the morning. She had been hospitalized. She had been for a long period of time without sleep. These factors affected the Defendant's ability to comprehend her situation. And this is demonstrated by the transcript of the questioning, which is to say that when she was giving her answers she responded, seemed to understand the questions, and addressed the questions as asked again and again without resentment.

However, when it was disclosed to her that Jason was dead, the enormity of the situation struck home to her and she be-

came largely incoherent from that point forward.

The implication of the court's findings here is that Humphrey was aware of and understood her rights up until the disclosure of the victim's death. This conclusion begs the question of how the disclosure affected Humphrey's understanding of her constitutional rights either generally or up until the disclosure. The trial court's mistake is in looking to "the defendant's ability to comprehend her situation," as opposed to her comprehension of her rights and the attendant waiver.

Accordingly, we accept the court's findings of fact, but reject the trial court's conclusions as a matter of law. Here, the court found that at the time of the waiver, Humphrey understood her rights, was not forced to relinquish those rights, responded to questions, and was rational. In effect, the court's observations point to a knowing and intelligent waiver. The remaining observations regarding Humphrey's physical, mental, and emotional state—while sympathetic—are not sufficient to outweigh the many other factors and indications that demonstrate a knowing and intelligent waiver. Accordingly, Humphrey's waiver is valid under the second prong of the *Miranda* waiver inquiry.

Having addressed the validity of Humphrey's *Miranda* waiver, we now address whether Humphrey's statements were involuntary.

## IV. Voluntariness

In reviewing the trial court's suppression of a confession or inculpatory statement, we defer to the trial court's resolution of disputed facts when supported by competent evidence in the record. *See People v. Gennings*, 808 P.2d 839, 844 (Colo.1991); *People v. Kaiser*, 32 P.3d 480, 483 (Colo.2001). Purely factual determinations by the trial court are accorded due deference. *Gennings*, 808 P.2d at 844. Thus, "if competent evidence supports the trial court's findings of fact, we give deference to them; conversely, we set aside findings of fact that are clearly erroneous or unsupported by the record." *People v. Platt*, 81 P.3d 1060, 1065 (Colo. 2004) (citing *People v. Minjarez*, 81 P.3d 348, 355 (Colo.2003)). In resolving a suppression motion, the trial court is "obliged to apply the correct legal standard to its factual findings." *Gennings*, 808 P.2d at 844 (citing *People v. Quezada*, 731 P.2d 730, 732–33 (Colo.1987)). And, "[j]ust as a trial court's application of an erroneous legal standard in resolving a suppression motion is subject to correction on appeal, so also is an ultimate legal conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings." *Id.* "When the controlling facts are undisputed, the legal effect of those facts constitutes a question of law which is subject to *de novo* review." *People v. Valdez*, 969 P.2d 208, 211 (Colo.1998).

The Due Process of law guaranteed by the United States Constitution prohibits the admission of involuntary statements into evidence. *See Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *People v. Medina*, 25 P.3d 1216, 1221 (Colo.2001). A defendant is protected regardless of whether the defendant was in custody when the statement was made, and regardless of whether the statement was inculpatory. *Medina*, 25 P.3d at 1221. Further, "[t]he fact that *Miranda* warnings precede a challenged confession does not insulate that confession from an inquiry into whether it was voluntarily given." *People v. Raffaelli*, 647 P.2d 230, 235 (Colo.1982). The prosecution must establish by a preponderance of the evidence that the statements were made voluntarily under the totality of the circumstances before those statements may be admitted into evidence. *Gennings*, 808 P.2d at 843–44.

Coercive conduct is a "necessary predicate to the finding that a confession is not 'voluntary,'" *Connelly*, 479 U.S. at 167, 107 S.Ct. 515, and must "play[ ] a significant role in inducing a confession or an inculpatory statement. . . ." *Medina*, 25 P.3d at 1222 (quoting *Valdez*, 969 P.2d at 211). Where coercive government conduct plays a significant role in inducing the inculpatory statement or statements, the statement is deemed involuntary. *Id.; Gennings*, 808 P.2d at 843–44. *See Connelly*, 479 U.S. at 163–67, 107 S.Ct. 515. Government coercion may

include physical as well as psychological coercion. *Gennings,* 808 P.2d at 843–44. "[T]he deliberate exploitation of a person's weaknesses by psychological intimidation can under certain circumstances constitute a form of governmental coercion that renders a statement involuntary." *Id.* at 844. "Ultimately, the test of voluntariness is whether the individual's will has been overborne." *People v. Miranda–Olivas,* 41 P.3d 658, 661 (Colo.2001).

■ In determining whether government coercion induced the defendant to incriminate herself, we weigh "the circumstances of pressure against the power of resistance of the person confessing." *Medina,* 25 P.3d at 1222 (quoting *Dickerson,* 530 U.S. at 434, 120 S.Ct. 2326). As part of those circumstances, the court may consider:

> whether the defendant was in custody or was free to leave and was aware of his situation; whether *Miranda* warnings were given prior to any interrogation and whether the defendant understood and waived his *Miranda* rights; whether the defendant had the opportunity to confer with counsel or anyone else prior to the interrogation; whether the challenged statement was made during the course of an interrogation or instead was volunteered; whether any overt or implied threat or promise was directed to the defendant; the method and style employed by the interrogator in questioning the defendant and the length and place of the interrogation; and the defendant's mental and physical condition immediately prior to and during the interrogation, as well as his educational background, employment status, and prior experience with law enforcement and the criminal justice system.

*Gennings,* 808 P.2d at 844.

Additionally, the official misconduct must be causally related to the confession or statement. *See Connelly,* 479 U.S. at 164, 107 S.Ct. 515. And, "[e]ven where there is a causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause." *Id.* at 164 n. 2, 107 S.Ct. 515. *See also People v. Wickham,* 53 P.3d 691, 694 (Colo.App.2001).

■ In reaching the conclusion that Humphrey's statements were involuntary, the trial court considered Humphrey's physical, emotional, and psychological state at the time of the interrogation but recognized that, alone, these circumstances did not render her statements involuntary. *See People v. Smith,* 716 P.2d 1115, 1118 (Colo.1986) ("Simply because the defendant became upset when she learned the victim had died was not a sufficient basis for the trial court's conclusion that her statement was involuntary.") (citing *Raffaelli,* 647 P.2d at 230). Accordingly, the court looked to the nature of the interrogation for evidence of official misconduct or coercion. The trial court's conclusion rested upon the circumstances of a discrete portion of the interview:

> And it was well after an hour into the questioning of the Defendant that she was first told that Jason was dead. The Defendant was clearly shaken by this news and cried and broke into uncontrollable sobbing. Her answers to the questions thereafter were emotional reactions that were only partially coherent.

> It was apparent from the questioning that only then did she realize the gravity of the situation, and it is apparent from the film—the DVD of the questioning of the Defendant that *the persistent questioning of the Defendant by the investigator after her emotional breakdown, was, under all of the circumstances . . . psychologically coercive.*

(Emphasis added). The trial court found "[i]t was apparent *during this segment* of the interrogation that the Defendant was under psychological coercion by the questioning of the officer." (Emphasis added). The court characterized Detective Stowell's questions as "argumentative and suggestive of answers, mischaracterizing what the Defendant had previously said." The court expressed no concern with Detective Stowell's interrogation methods prior to the disclosure.

Because the court's factual findings divide the interrogation into two time segments, pre- and post-disclosure of the victim's death, we address them accordingly. In the first segment, the lack of official coercion renders

the pre-disclosure statements admissible under *Connelly*. Assuming arguendo that the post-disclosure statements were coerced, this does not affect the voluntariness of the pre-disclosure statements. Accordingly, we find the pre-disclosure statements were erroneously suppressed by the trial court. In the second segment, an examination of whether the facts support the court's legal conclusion is necessary to determine whether the post-disclosure statements are admissible.

■■■ Affording due deference to the trial court's findings of fact, we weigh "the circumstances of pressure against the power of resistance of the person confessing." *Medina*, 25 P.3d at 1222 (quoting *Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326). Here, Humphrey's circumstances at the time of the interrogation suggest she was particularly vulnerable. The trial court's detailed findings regarding Humphrey's physical, emotional, and mental state support the conclusion that Humphrey had little power to resist coercive pressure. This was especially apparent during the post-disclosure segment of the interrogation where Humphrey broke down sobbing and was largely unable to compose herself or respond to questions.

After disclosing the victim's death, Detective Stowell immediately asked several suggestive questions of Humphrey. Detective Stowell paused frequently and made attempts to get Humphrey to calm down and compose herself. Humphrey sobbed continuously, and although she responded to questions, her demeanor was substantially less composed than it had been earlier in the interrogation.

Humphrey's responses to questions during this portion of the interview did not shed any new light on the events that transpired or deviate significantly from her statements earlier in the interrogation. She made several statements to the effect that she did not intend to hurt anyone, did not want to take anyone's life, and did not want to stab the victim. She also expressed bereavement and asked if anyone had contacted the victim's mother. In response to Detective Stowell's assertions that Humphrey lost her temper and wanted the victim to feel pain because he had hurt her, Humphrey stated: "He beat me up." This statement echoed her earlier responses to similar lines of questioning.

Humphrey also alluded to the fact that she had lied to her mother, apparently concerning her whereabouts earlier in the day. Humphrey also made statements concerning how her mother would react and made several requests to speak with her mother. Finally, Humphrey told Detective Stowell about a separate altercation the week before in which Humphrey had been beaten by an unknown assailant or assailants—an incident she had not previously disclosed in the interrogation.

Although these statements were not especially damaging—particularly in the context of her earlier responses during questioning—they may, nonetheless, be viewed as the product of psychological coercion. Detective Stowell's questions following Humphrey's breakdown imply he sought to take advantage of Humphrey's emotional state or, at the least, to disrupt her narrative with the shock value of the victim's death. The trial court found that given Humphrey's weak and vulnerable state, these tactics were psychologically coercive.

Here, we do not opine as to whether our independent review of the facts would yield the same result. Instead, we defer to the trial court's resolution of disputed facts, as it is consistent with and supported by evidentiary findings. *See Gennings*, 808 P.2d at 844. *See also People v. McIntyre*, 789 P.2d 1108 (Colo.1990) (affirming suppression ruling where there was sufficient evidence to support trial court's finding that officer was aware of defendant's fragile mental and emotional condition and exploited weakness to obtain confession); *Raffaelli*, 647 P.2d at 230 (upholding trial court's finding of involuntariness where defendant was under substantial emotional stress and nature of interrogation was accusatory).

In looking to Humphrey's physical, mental, and emotional state, as well as the circumstances of interrogation and the methods of interrogation, the trial court took the appropriate factors into account and thus applied the correct legal standard. *See Gennings*, 808 P.2d at 844. The trial court's findings—particularly Humphrey's susceptibility to

pressure and the finding of official coercion—support the trial court's conclusion that Humphrey's will had been overborne.

Where the facts are disputed, we defer to the trial court's factual findings, and where the application of law is correct, we do not disturb the court's ruling on that account. *See id.; Valdez,* 969 P.2d at 211. Where factual determinations include coercion and susceptibility, we have traditionally deferred to the trial court's conclusion of involuntariness. *See, e.g., McIntyre,* 789 P.2d at 1111; *People v. Pearson,* 725 P.2d 782, 784 (Colo. 1986); *Raffaelli,* 647 P.2d at 230.

In these circumstances, where the trial court has applied the correct legal standard and reasonable interpretations of the facts may differ, we defer to the trial court's resolution of disputed facts and affirm the ultimate legal conclusion of involuntariness. Accordingly, we affirm the trial court's order to suppress the statements made during the post-disclosure segment of the interrogation, in which the record adequately supports the trial court's finding that the prosecution failed to prove by a preponderance of the evidence that Humphrey's statements were voluntary.

## V. Conclusion

We find that the trial court's rulings on the *Miranda* waiver and the voluntariness of the pre-disclosure statements are not supported by the record. Apart from the post-disclosure segment of the interrogation, the key element of government coercion in eliciting Humphrey's statements was absent. While there were a number of circumstances which adversely affected Humphrey, these circumstances did not render all of her statements involuntary, nor did they compromise the validity of her *Miranda* waiver. Nevertheless, we do find that the record adequately supports the trial court's voluntariness conclusion with respect to the post-disclosure statements.

Consistent with these findings, we reverse the trial court's order suppressing Humphrey's statements in part and affirm in part.

COATS, J., concurs in part and dissents in part.

EID, J., joins in the concurrence and dissent.

Justice COATS, concurring in part and dissenting in part.

I concur in that portion of the majority's judgment reversing the district court's finding of a *Miranda* violation, but I cannot agree that the statements made by the defendant after learning of her stabbing victim's death should be suppressed as involuntary. Although the statements suppressed by the majority were clearly intended to be exculpatory and add little to the defendant's earlier statements, I write separately because I believe the majority's holding will nevertheless substantially impact the law of confessions in this jurisdiction. In particular, I believe the majority goes awry in holding that a trial court's ultimate determination of voluntariness can be entitled to deference by a reviewing court; in finding that the district court in this case applied the correct legal standard; and in failing to determine, on its own, that the defendant's statements were not involuntary within the meaning of the Due Process Clause.

Well before the United States Supreme Court held that the Fifth Amendment's Self-Incrimination Clause was incorporated in the Due Process Clause of the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), and that the Self-Incrimination Clause extended beyond the courtroom to custodial interrogation by the police, *see Miranda v. State,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it had acquired jurisdiction over confessions in state criminal cases by holding that involuntary confessions were barred by the Due Process Clause of the Fourteenth Amendment itself, *see Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). *See generally Dickerson v. United States,* 530 U.S. 428, 432–35, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (recounting the development of and distinctions between the requirements of *Miranda* and the due process voluntariness test). Although the Court's due process jurisprudence excluding involun-

tary confessions has never been abandoned, in situations of custodial interrogation its focus has shifted to the prophylactic warnings of *Miranda*, developed specifically to guard the privilege against self-incrimination in an inherently coercive atmosphere. *Id.* at 434–35, 120 S.Ct. 2326. And while statements made after a voluntary and knowing waiver of *Miranda* rights may still be rendered involuntary by improper threats or promises, or by coercion, it is clearly more difficult for one who is told he is free to refuse to answer questions to complain that his answers were the product of intimidation or psychological coercion. *Cf. Colorado v. Spring*, 479 U.S. 564, 576, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (quoting *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled.").

Because of the "hybrid quality" of the voluntariness inquiry or the intermediate inference of "psychological fact" that must be drawn from the historical facts, *see Miller v. Fenton*, 474 U.S. 104, 116, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), an ultimate finding of voluntariness has come to be understood as a mixed question of fact and law, requiring independent or plenary review, rather than a finding of simple historical fact. *See, e.g., Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Beavers v. State*, 998 P.2d 1040, 1044 (Alaska 2000); *People v. Jablonski*, 37 Cal.4th 774, 38 Cal.Rptr.3d 98, 126 P.3d 938, 965 (2006); *State v. Fields*, 265 Conn. 184, 827 A.2d 690, 698 (2003); *State v. Buch*, 83 Hawai'i 308, 926 P.2d 599, 612 (1996); *Light v. State*, 547 N.E.2d 1073, 1076 (Ind.1989); *State v. Bell*, 276 Kan. 785, 80 P.3d 367, 375 (2003); *State v. Coombs*, 704 A.2d 387, 390 (Me.1998); *Gorge v. State*, 386 Md. 600, 873 A.2d 1171, 1177 (2005); *State v. Miller*, 573 N.W.2d 661, 672 n. 2 (Minn.1998) (addressing whether waiver of right to counsel was voluntary, but noting that standard of independent review is analogous to assessing whether a defendant's statements or confessions were voluntary); *State v. Cooper*, 124 N.M. 277, 949 P.2d 660, 665 (1997); *State v. Hyde*, 352 N.C. 37, 530 S.E.2d 281, 288 (2000); *State v. Acremant*, 338 Or. 302, 108 P.3d 1139, 1152–53 (2005); *Com. v. Templin*, 568 Pa. 306, 795 A.2d 959, 961 (2002); *State v. Morato*, 619 N.W.2d 655, 659 (S.D.2000); *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993); *Midkiff v. Com.*, 250 Va. 262, 462 S.E.2d 112, 116 (1995); *State v. Singleton*, 218 W.Va. 180, 624 S.E.2d 527, 531 (2005) ("This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making the determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions."); *State v. Clappes*, 136 Wis.2d 222, 401 N.W.2d 759, 765 (1987); *Simmers v. State*, 943 P.2d 1189, 1194 (Wyo.1997). *But see State v. Ford*, 144 N.H. 57, 738 A.2d 937, 941 (1999) ("We are aware that, in contrast to our traditional deferential review of voluntariness of confessions, the federal courts apply a *de novo* review.").

Prior to *Miller*, like many other jurisdictions, we treated a trial court's finding of involuntariness, as long as it was based on a correct legal standard, as a finding of fact, entitled to deference by reviewing courts. *See, e.g., People v. Raffaelli*, 647 P.2d 230, 236 (Colo.1982) ("A trial court's finding of fact on the voluntariness of a confession ...."). Although we were perhaps slower in this context than some others to expressly distinguish the *application* of a correct legal standard from the *correctness* of the standard itself, and to treat the former as well as the latter as a question of law, subject to plenary review, we have now long accepted this understanding. *See People v. Gennings*, 808 P.2d 839, 844 (Colo.1991) ("Just as a trial court's application of an erroneous legal standard in resolving a suppression motion is subject to correction on appeal, so also is an ultimate legal conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings."); *see also People v. Valdez*, 969 P.2d 208, 211 (Colo.1998) ("When the controlling facts are undisputed, the legal effect of those facts constitutes a question of law which is subject to *de novo* review.").

In this jurisdiction, we first had occasion to articulate this distinction in the context of a waiver of *Miranda* rights, *see People v. Quezada,* 731 P.2d 730, 732–33 (Colo.1987) (whether invocation of right to remain silent was scrupulously honored), but quickly recognized its applicability to the suppression of statements required by the due process standard. *See Valdez,* 969 P.2d at 211; *Gennings,* 808 P.2d at 844. More recently, with regard to the determination of custodial interrogation, we have written at length about the importance of this appellate principle, emphasizing our obligation to independently review mixed questions of law and fact and expressly adopting the Supreme Court's guidance from *Thompson v. Keohane,* 516 U.S. 99, 113–15, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), and *Ornelas v. United States,* 517 U.S. 690, 696–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). *See People v. Matheny,* 46 P.3d 453, 459–61 (Colo.2002). Those holdings, of course, rely upon and were derived largely from its rationale in *Miller v. Fenton,* 474 U.S. at 113–18, 106 S.Ct. 445, regarding the due process, voluntariness standard. Until today's holding—that we defer to a trial court's conclusion of involuntariness whenever its factual determinations include coercion and susceptibility, maj. op. at 363—it therefore appeared to be settled that a trial court's application of the due process standard to find statements involuntary was in the nature of a mixed question of fact and law and was subject to plenary review.

While the voluntariness component of a waiver of *Miranda* rights and the voluntariness of a statement itself involve similar considerations, *see Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), and we have previously followed the Supreme Court's lead in treating both as questions of law, the effectiveness of a waiver of *Miranda* rights and the voluntariness of particular statements involve distinctly different inquiries, with distinctly different consequences. *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (distinguishing *Miranda* from due process violation with regard to derivative evidence); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (distinguishing *Miranda* from due process violation

for impeachment purposes). Even if a trial court's application of the correct legal standard for voluntariness were to be treated as a question of fact under certain circumstances, and were entitled to deference by a reviewing court, as the majority now holds, the record in this case could not more clearly demonstrate the district court's confusion about the applicable legal standard.

Although in one sentence of its 22–page ruling, the district court characterized the defendant's statements made after learning of the victim's death as involuntary, that single sentence fell within a lengthy discussion of the defendant's waiver of her *Miranda* rights. Specifically, it concluded an inquiry into the voluntariness of the defendant's waiver and immediately preceded an inquiry whether the waiver was also knowing and intelligent. When asked for clarification about use of these statements for impeachment, the court responded, "But for purposes of impeachment, they were not shown to be involuntary." *Cf. Harris,* 401 U.S. at 226, 91 S.Ct. 643 (unlike statements that are actually involuntary, statements merely taken in violation of *Miranda* may be used for impeachment). It is therefore far from clear that the district court intended a separate ruling on due process grounds. The majority itself, in reversing the district court's *Miranda* ruling, characterizes that court's findings on the issue of government coercion as inconsistent. Maj. op. at 357.

In addition to confounding the voluntariness of the defendant's waiver of her *Miranda* rights with the voluntariness of her statements, the district court also appeared to conflate the volitional and cognitive aspects, or prongs, of the *Miranda* inquiry, *see Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *People v. May,* 859 P.2d 879 (Colo.1993), making clear its own understanding that "to be voluntary an act must be informed." In reliance on a holding of this court that was subsequently rejected by the United States Supreme Court, *see People v. Spring,* 713 P.2d 865 (Colo.1986), *rev'd sub nom. Colorado v. Spring,* 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (holding instead that a suspect's awareness of the possible sub-

jects of questioning was not relevant to an effective *Miranda* waiver)[1], it erroneously concluded that the failure to inform the defendant of her victim's death rendered her *Miranda* waiver ineffective. Upon that basis, and that basis alone, the court granted the motion to suppress. Ironically, the majority now attributes to the district court a determination that finally informing the defendant of the victim's death rendered her later statements involuntary.

The majority rejected the district court's *Miranda* ruling as confused and inconsistent. *See* maj. op at 360. Assuming the district court even intended to make a separate ruling on due process grounds, the majority should have rejected that ruling for the same reasons.

Finally, if the majority had exercised its independent legal judgment (as I believe it was obliged to do), the applicable Supreme Court jurisprudence would have mandated a determination that the police conduct in this case did not amount to a violation of due process. Despite some earlier indications that the due process standard required the exclusion of any confession that was not the product of a "rationale intellect and a free will," *Blackburn v. Alabama,* 361 U.S. 199, 208, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *see also Townsend v. Sain,* 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), the Supreme Court has since made abundantly clear that the Due Process Clause is not concerned with the reliability of a defendant's statements or the defendant's subjective state of mind, apart from the effects of police overreaching. *Connelly,* 479 U.S. at 166–67, 107 S.Ct. 515. While the fragility of a suspect's mental or emotional condition is certainly relevant to the nature and degree of police overreaching necessary for her will to be overborne, the due process analysis is concerned with deterring police misconduct. *Id.*

As the majority itself finds, the defendant was properly advised of her *Miranda* rights and voluntarily, knowingly, and intelligently decided to waive those rights and talk to the police. At no time during the interview, which lasted less than two hours, did she make any attempt to invoke either her right to remain silent or her right to have an attorney present, despite having been expressly informed that she could do so. There was no suggestion that she was threatened or improperly promised anything for her cooperation, much less physically abused in any way. The district court merely found the police tactics to be "psychologically coercive," on the grounds that the officers tried to take advantage of her emotional state.[2]

Although *Miranda* requires police to scrupulously honor any invocation of a suspect's right to remain silent, *see Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), it does not require them to evaluate the suspect's emotional condition and cease questioning if she becomes too distressed by the realization of what she has done. At least since *Connelly,* it is clear that the due process standard is not concerned with a suspect's state of mind, apart from police overreaching. *But see People v. Raffaelli,* 647 P.2d 230 (Colo.1982) (holding the opposite in reliance upon the same "rational intellect" and "free will" interpretation of *Culombe* and *Townsend* for which this court was reversed several years later in *Connelly* ). As long as a suspect is not mistreated by the police or improperly induced to respond by threats or promises, the inherently coercive nature of custodial interrogation is adequately offset by the dictates of *Miranda,* and the reliability of any statements to be used as evidence is separately ensured by local statutes and court rules, *Connelly,* 479 U.S. at 167, 107 S.Ct. 515.

In this case, the defendant was not only willing to answer but consistently sought to excuse her own conduct, even (and perhaps especially) after learning of the victim's death. Because the police did nothing more

---

1. Interestingly, the majority also continues to rely on pre-*Colorado v. Spring* case law including awareness of the subject matter as a factor in evaluating a *Miranda* waiver. *See* maj. op. at 356.

2. Although the majority characterizes the district court as concluding "that Humphrey's will had been overborne," maj. op. at 363, I see no indication that it understood that to be the standard.

than persist in interrogating the defendant in the absence of a refusal to answer particular questions or any expression of a desire to terminate the questioning altogether, I do not believe their conduct can be characterized as improper and thereby render admission of the defendant's statements a violation of the Due Process Clause, regardless of her emotional condition. I would be hard put to explain to these officers where they went wrong or identify for them which of their acts the Due Process Clause seeks to deter.

I therefore respectfully dissent from the majority's suppression of all statements made by the defendant after learning of the victim's death.