FILED
United States Court of Appeals
Tenth Circuit

March 6, 2015

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NAIF AL-YOUSIF,

     Petitioner - Appellee,

v.

TRAVIS TRANI, Warden, Colorado State
Penitentiary; JOHN W. SUTHERS,
Attorney General of the State of
Colorado,

     Respondents - Appellants.

No. 14-1084

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:12-CV-01742-RPM)**

Ryan A. Crane, Assistant Attorney General (John W. Suthers, Attorney General, with
him on the briefs), Denver, Colorado, for Respondents - Appellants.

Brett Daniel Lampiasi, Law Office of Brett Daniel Lampiasi, Hatfield, Massachusetts,
and Henry L. Solano, Wilson Elser Moskowitz Edelman & Dicker LLP, Denver,
Colorado, (Steven M. Feder and Barry Boughman, Feder Law Firm, Denver, Colorado,
with them on the brief), for Petitioner - Appellee.

Before **HARTZ**, **MATHESON**, and **MORITZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

The United States District Court for the District of Colorado granted Defendant Naif Al-Yousif's application for a writ of habeas corpus under 28 U.S.C. § 2254. Although the application was untimely filed, the district court granted equitable tolling and proceeded to the merits. It ruled that the state-court decision was both contrary to and an unreasonable application of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Moran v. Burbine*, 475 U.S. 412 (1986). The State of Colorado appealed. (It did not need to obtain a certificate of appealability. *See* Fed. R. App. P. 22(b)(3).) We have jurisdiction under 28 U.S.C. §§ 1291 and 2253 and reverse.

## I.       BACKGROUND

The facts are largely undisputed. Defendant, a native of Saudi Arabia, moved to the United States in 1996 to study English. He attended an English-language program for 14 months, advancing from no English comprehension or speaking ability to the ability to carry on a basic conversation.

Defendant's conviction was for the murder of Abdulaziz Al-Kohaji on January 10, 2001. *See People v. Al-Yousif*, 206 P.3d 824, 828 (Colo. App. 2006) (*Al-Yousif II*). The victim flew to Denver that day and was driven from the airport to his apartment by Defendant's cousin (Mishal Al-Swaidy) and brother, who expected to see him later at dinner. But Defendant picked the victim up at the apartment and drove him to the home Defendant shared with Al-Swaidy and their roommate, Tariq Al-Dossary. Defendant left the house to buy groceries. When he returned, the victim was tied to a chair. Al-Dossary

2

forced him to disclose his financial-account information and then strangled him to death with a rope while Defendant and Al-Swaidy watched. The three men disposed of the body in a dumpster. Defendant and Al-Dossary sold the victim's car, cashed $1,000 of the victim's cashier's checks, and withdrew $19,900 from his bank account. Al-Dossary and Al-Swaidy fled to Saudi Arabia. Defendant initially fled to California but returned to Colorado after speaking to his brother.

Detective Gene Guigli arrested Defendant when he returned. On the way to the police station, Defendant said words to the effect of "I know all about it," and appeared eager to talk. *People v. Al-Yousif*, 49 P.3d 1165 (Colo. 2002) (*Al-Yousif I*) App. A (Order on Mot. to Suppress Statements, *People v. Al-Yousif*, No. 01 CR 1861 (Dist. Ct. Colo. Dec. 20, 2001) (Order to Suppress)), at 1178 (internal quotation marks omitted). Guigli briefly advised Defendant of his rights and instructed him not to talk while being transported.

At the station, Guigli and Detective Mike Martinez questioned Defendant while being videotaped. After asking Defendant the spelling and pronunciation of his name and his date of birth, address, and phone number, Martinez said, "[L]et me first advise you of your rights. Okay?" Tr. of Interview at 3, *Al-Yousif v. Trani*, No. 1:12-cv-01742-RPM (D. Colo. Nov. 16, 2002) (Doc. No. 19-2) (Tr.). He then read, without pausing, from a printed form:

> Martinez: Okay. You have the right to remain silent. Anything you say can be used as evidence against you in court.

3

Al-Yousif:  [Nods head]

Martinez:  You have the right to talk to a lawyer before questioning and have him present—

Al-Yousif:  [Nods head]

Martinez:  —during questioning.  If you cannot afford a lawyer, one will be appointed for you without cost to you before questioning.

Al-Yousif:  [Nods head]

*Id*.; *see* Order to Suppress, 49 P.3d at 1180.

Martinez checked off each right as he read.  *See* Order to Suppress, 49 P.3d at 1180.  When asked if he understood, Defendant "nodded and mumbled something that sound[ed] like an affirmative response."  *Id.*  Martinez asked whether Defendant was sure, and he responded yes.  Martinez then turned the form to face Defendant and said: "I need your signature here to show you were the person advised of your rights."  *Id.* (internal quotation marks omitted).  Defendant signed his name.  Martinez continued: "[I]t says here, 'Knowing my rights and knowing what I'm doing, I now wish to voluntarily talk to you.'  To talk with us, I need your signature on that line."  Tr. at 4.  He pointed to the signature blank in the waiver portion of the form.  *See* Order to Suppress, 49 P.3d at 1180.  Defendant signed his name without asking any questions.  *See id.* Martinez twice asked whether any promises or threats had been made to Defendant to

have him make a statement. *See id.* Defendant responded "What statement?"[1] *Al-Yousif I*, 49 P.3d at 1170 (internal quotation marks omitted). Guigli said that Martinez meant that they "didn't make any threats to hurt you or physically harm, or mentally harm you to make this statement. It's voluntary?" Tr. at 4. Defendant shook his head and said "You didn't." Tr. at 5.

Nevertheless, when Guigli asked, "And you're voluntarily going to talk to us about what happened," Defendant said that he would not speak to the detectives until the victim's uncle arrived. *Id.* Guigli responded, "You understand we have to talk first." Order to Suppress, 49 P.3d at 1182 (internal quotation marks omitted). Defendant initially said, "We'll talk," Tr. at 5; but after Martinez said, "Tell us what happened to [the victim]," *id.* at 8, Defendant repeated, "I don't feel like talking until his uncle comes," Order to Suppress, 49 P.3d at 1182 (internal quotation marks omitted). Guigli said, "We can't bring the uncle into this interview." *Id.* (internal quotation marks omitted).

Defendant then answered questions with inculpatory statements that led to his conviction. During the interview Defendant "stated that he was good friends with the victim," *id.*, that he had spoken to the victim's uncle and told him that he would explain what happened when the uncle came to Colorado, and that in Saudi Arabia the victim's

---

[1] The Colorado trial court found that Defendant asked "What's a statement?" Order to Suppress, 49 P.3d at 1180 (internal quotation marks omitted). But the Colorado Supreme Court, which reviewed the videotape, found that he said "What statement?" *Al-Yousif I*, 49 P.3d at 1170 (internal quotation marks omitted).

5

parents would decide his punishment. Late in the interview, the detectives asked Defendant whether he expected to go to prison. He said no and asked the detectives what would happen if the victim's uncle said to let Defendant go. A detective said: "You have been here long enough. You know we have courts like across the street, that big courthouse. That's up to a judge and jury what happens to you. Do you understand that?" Tr. at 78. The interview lasted 90 minutes before Defendant agreed to take the detectives to the dumpster where he and the other men had disposed of the body.

When Defendant and the detectives returned to the station, Detective Martin Vigil asked Defendant how long he had been in the United States, if Defendant had understood him, and whether Defendant had understood everything in the earlier interview. He responded affirmatively and said that although "he sometimes has a problem understanding" he would ask for an explanation if he did not understand. Order to Suppress, 49 P.3d at 1181. Vigil provided a third *Miranda* advisement, offering some explanation or paraphrase after each right. Defendant then said that he wanted an attorney, and the detectives ended the interview.

Before trial, Defendant moved to suppress the video of his police interrogation, asserting that he had not knowingly and intelligently waived his *Miranda* rights. At the suppression hearing, he called three witnesses who testified that he had not understood his rights because of his cultural background and limited English proficiency. One expert, Dr. Mohammed Amin Kohlwadia, testified that Defendant had poor English skills compared to other Arabic-speaking students and that he found it more difficult to explain

6

legal concepts to him. Dr. Kholwadia also testified that "nodding . . . does not necessarily mean that an Arab person understands everything but can mean that he wants more explanation." *Id.* He said that "some of the terms used in the advisement such as 'right' and 'evidence' could translate into two or three different meanings." *Al-Yousif I*, 49 P.3d at 1171. And he related that there is no right not to speak to the police in Saudi Arabia, and that when he reviewed the advisement form with Defendant the morning of the hearing, Defendant understood the words but had difficulty with the concept of the right to remain silent. The other two witnesses had taught Defendant English. They testified that he would nod and say that he understood even when he did not understand the full meaning of what was being said. One testified that Defendant had reached a fifth-grade level of English reading and that comprehension of the *Miranda* advisement requires a seventh-grade reading level for a native speaker. *See* Order to Suppress, 49 P.3d at 1181. Two friends testified that Defendant had limited English proficiency and that they had assisted Defendant with forms in English.

The trial court's "impression from multiple reviews of [the videotaped interrogation] [was] that defendant had a fair ability to converse with the detectives in English." *Id.* at 1180. It noted that Defendant "frequently respond[ed] 'Huh?' to questions and had trouble with certain words [but] responded appropriately to most of the questions posed to him." *Id.* Nonetheless, the court concluded that, although Defendant demonstrated the ability to engage in casual conversation, the State had failed to show that Defendant knowingly and intelligently waived his *Miranda* rights. It therefore

7

suppressed his statements. On an interlocutory appeal by the State, the Colorado

Supreme Court reversed, ruling that Defendant "did sufficiently understand his rights and

that the waiver was, therefore, valid." *Al-Yousif I*, 49 P.3d at 1167. The videotaped

interrogation was admitted into evidence at Defendant's trial, and a jury convicted him of

felony murder, robbery, accessory after the fact, concealing death, and theft by receiving.

He was sentenced to life imprisonment without parole.

On direct appeal the Colorado Court of Appeals vacated the conviction for theft by

receiving, merged the robbery and felony-murder convictions, and otherwise affirmed the

trial court. The Colorado Supreme Court initially granted certiorari but later denied it as

having been improvidently granted. The court then denied a petition for rehearing.

Defendant filed an unsuccessful motion for postconviction relief, and the Colorado

Supreme Court denied review.

## II.    DISCUSSION

### A.    Equitable Tolling

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), an

application for relief under 28 U.S.C. § 2254 ordinarily must be filed within one year

after a state judgment becomes final either by the conclusion of direct review or the

expiration of time for seeking direct review. *See* 28 U.S.C. § 2244(d)(1)(A). But "[t]he

time during which a properly filed application for State post-conviction [relief] is pending

shall not be counted." *Id.* § 2244(d)(2). Equitable tolling may further extend the

limitations period "if [an applicant] shows (1) that he has been pursuing his rights

8

diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (internal quotation marks omitted). We review for abuse of discretion a district court's decision to grant or deny equitable tolling. *See Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001).

Defendant does not dispute on appeal that the application was untimely filed. The Colorado Supreme Court denied his motion for rehearing on direct review on April 7, 2008. He then had 90 days (actually 91, because the 90th day was Sunday July 6) to petition the United States Supreme Court for a writ of certiorari; when that time expired on July 7, 2008 (he failed to file a petition), the state judgment became final and the one-year limitations period began. *See Woodward v. Cline*, 693 F.3d 1289, 1292 (10th Cir. 2012). Defendant was entitled to statutory tolling of the one-year limitations period while his state postconviction proceedings were pending from April 14, 2009, to April 9, 2012, *see* 28 U.S.C. § 2244(d)(2), but 281 days had already elapsed between July 7, 2008, and April 13, 2009. The remaining 84 days of the limitations period then expired on July 2, 2012. Defendant filed his habeas application three days late on July 5, 2012.

Defendant originally asserted in his § 2254 application that it was timely because the Colorado Supreme Court had denied the motion for rehearing on direct appeal on April 10, 2008, and therefore the limitations period began to run 90 days later on July 9, 2008. Using this date, only 278 days of the one-year limitations period would have

9

elapsed before he filed his state postconviction claims and the limitations period would have expired on July 5, 2012, the date of filing.

The State responded that the application was untimely, saying that it appeared that "Applicant may have miscalculated the date by relying on the trial court's notation (in its minute orders) for the date on which the Colorado Supreme Court denied his petition for rehearing on direct appeal." Answer at 14, *Al-Yousif*, No. 1:12-cv-01742 (Aug. 14, 2012) (Doc. No. 11) (Answer). The State argued that the April 10 trial-court entry reflected the date that the court was notified of the Supreme Court decision, not the date of the decision itself. It attached several documents. One was the Supreme Court's order, which displays the date it was issued, April 7, 2008. Another was a document that it described as "Data Access state trial court database, case 01CR1861," Answer at 111; it is a printout marked "confidential" that displays an April 10, 2008 entry stating "Order Of Ct From The Colo Supreme Ct-petn For Rehearing-denied-," Answer, Ex. 1 at 8 (Doc. No. 11-1). According to the State, "[t]he trial court . . . apparently did not become aware of the denial until April 10, 2008—the date reflected in its minute orders." Answer at 14.

In reply, Defendant argued that the application was timely and attached the document he relied on for the date of April 10, 2008. The document has the heading "Integrated Colorado Online Network (ICON)." Ex. 1 to Supp. Amend. at 1, *Al-Yousif*, No. 1:12-cv-01742 (Nov. 26, 2012) (Doc. No. 19-1) (Ex. 1). It appears to contain the same information as the document the State attached to its brief but in a different format and not marked confidential. It includes an entry that states:

10

4/10/2008 Order
OF CT FROM THE COLO SUPREME CT-PETN FOR REHEARING-
DENIED-

Ex. 1 at 19.

In a district-court motion requesting oral argument, Defendant continued to assert

that the application was timely "based on the official record, [but] to the extent the Court

is inclined to entertain the State's contention that [the] application should be barred as

untimely, [Defendant] should be afforded the opportunity to detail the circumstances that

would support . . . equitable tolling." *See* Mot. for Hr'g/Oral Arg. on all Non-

Evidentiary-Dependent Dispositive Claims Presented in Pet. for Habeas Relief at 6,

*Al-Yousif*, No. 1:12-cv-01742 (Jan. 31, 2013) (Doc. No. 25). The State responded that it

relied on the Colorado Supreme Court order itself and that the relevant information was

contained in "public records available through the trial court clerk." Resp. to Applicant's

Mot. for a Hr'g at 3, *Al-Yousif*, No. 1:12-cv-01742 (Feb. 4, 2013) (Doc. No. 26). It

argued that Defendant's motion did not "suggest any basis on which [equitable tolling]

would apply, and [the State was] aware of none." *Id.* Defendant replied that he "relied

on the Register of Actions given to him by the state court and maintained in the [ICON]

system," referring to the exhibit he had attached to his reply in support of his application.

Reply in Support of Mot. for Oral Arg. at 2–3, *Al-Yousif*, No. 1:12-cv-01742 (Feb. 15,

2013) (Doc. No. 28). He argued that he was entitled to rely on the document because the

Register of Actions is an official state-court record under Colorado Chief Judicial

11

Directive 5-01 and "memorializes every trial court filing and appellate court action." *Id.* at 3.

At a hearing in district court, Defendant argued that "the bottom line is that an arm of the Government made a mistake in putting this date of the judgment—I'm sorry—the July 7th judgment into the ICON . . . system, which is a public system and . . . becomes a certified court document," Oral Args. of Tr. of Proceedings at 6, *Al-Yousif*, No. 1:12-cv-01742 (Oct. 21, 2013) (Doc. No. 43), and that he "was clearly justified in relying on the register of actions that was . . . given to him by the State," *id.* at 8. The district court applied equitable tolling, without permitting the State to argue in response or make a record. Its later order stated that Defendant relied on the date the trial court recorded the order on the Registry of Actions, which "[t]he State maintains . . . exclusively, and . . . is the only public notice of the entry of court orders." Aplt. App. at 13–14. The order noted that "[t]here [was] no reference to an April 7, 2008 Supreme Court order in the system," *id.* at 12, and determined that "counsel reasonably relied on that public record in calculating the days remaining in the AEDPA limitations period," *id.* at 14. The court concluded that "[t]he inaccurate recording of the date of the Colorado Supreme Court's order denying rehearing was an extraordinary circumstance beyond counsel's control." *Id.* at 13.

We beg to differ with the district court. "Equitable tolling is a rare remedy to be applied in unusual circumstances . . . ." *Yang v. Archuleta*, 525 F.3d 925, 929 (10th Cir. 2008) (internal quotation marks omitted). "An inmate bears a strong burden to show

12

specific facts to support his claim of extraordinary circumstances and due diligence." *Id.* at 928 (brackets and internal quotation marks omitted).

In our view, Defendant failed to satisfy his burden. The gist of his argument is that the State misled his attorney because the entry in ICON was incorrect. But that is not at all clear. The ICON entries appear to be taken from the trial-court record, and trial courts ordinarily enter the date when something happens at *that* court. For example, the entry at issue gives the date for "Order of Ct *from* the Colo Supreme Ct," Ex. 1 at 19 (emphasis added, full capitalization omitted), not "Order of Ct *by* the Colo Supreme Ct." An entry for January 14, 2002, illustrates the point. It states: "Supreme Ct Ordr of Ct: Motn for Ext of Time to File Rec on Interlocutory Appeal - Grtd to and Including Jan 15 2002 by the Ct 01-10-02." Ex. 1 at 7 (full capitalization omitted). This certainly appears to state that the January 14 entry reflects the receipt by the trial court of a Supreme Court order dated January 10. And the published Supreme Court decision of July 1, 2002, reversing the suppression of Defendant's confession, *see Al-Yousif I*, 49 P.3d at 1165, is reflected in a July 3, 2002 entry in ICON, Ex. 1 at 8. Although there may be some ambiguity about what the ICON dates mean, Defendant presented no evidence regarding what, if anything, his attorney asked when he obtained the document, and what, if any, explanation was provided. And the district court refused to hear any proffer or argument by the State, which may have clarified the matter.

Moreover, Defendant put on no evidence to demonstrate that he had to resort to, and rely on, ICON to determine the filing date of the state supreme court's decision

denying rehearing.  In particular, why could he not have obtained a copy of the decision from prior defense counsel or from the Colorado Supreme Court itself?  We also note that the correct date of the decision appears on Westlaw, *Al-Yousif v. People*, No. 07SC36, 2007 WL 1395329 (Colo. May 14, 2007), *cert. denied as improvidently granted* (Mar. 7, 2008), *rehearing denied* (Apr. 7, 2008) (follow "History" hyperlink), and the decision itself appears on Lexis, *Al-Yousif v. Colorado*, No. 07SC36, 2008 Colo. LEXIS 351, at *1 (Colo. Apr. 7, 2008).  In short, Defendant did not establish the requisites for equitable tolling, and the district court abused its discretion in applying too lenient a standard for such tolling.

### B.    *Miranda*

In any event, Defendant loses on the merits of his *Miranda* claim.  Although the federal district court ruled in Defendant's favor, that court's decision is not entitled to any deference.  "We review the district court's legal analysis of the state court decision de novo."  *Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) (internal quotation marks omitted).

In contrast, we owe great deference to the decision of the Colorado Supreme Court denying Defendant's *Miranda* claim.  Under AEDPA, a federal court may not grant habeas relief to a state prisoner with respect to a claim rejected on the merits in state court unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in

14

light of the evidence presented" in state court, *id.* § 2254(d)(2). Clearly established law consists of "the holdings, as opposed to dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (internal quotation marks omitted). A state-court decision is contrary to clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite] result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

"It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013) (per curiam) (internal quotation marks omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Although "§ 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," *id.*, it "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal," *id.* (internal quotation marks omitted).

Further, state-court findings of fact are entitled to great deference. Under 28 U.S.C. § 2254(e)(1),

> In a proceeding by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

"The presumption of correctness also applies to factual findings made by a state court of review based on the trial record." *Morgan v. Hardy*, 662 F.3d 790, 797–98 (7th Cir. 2011) (citing pre-AEDPA decision in *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981)); *see Rolan v. Vaughn*, 445 F.3d 671, 678–81 (3d Cir. 2006) (same).

The Colorado Supreme Court concluded that when the trial court suppressed Defendant's statements, it "required a deeper appreciation of the implications and consequences of a waiver than does [Colorado] case law." *Al-Yousif I*, 49 P.3d at 1167. The court reviewed de novo "the question of whether the defendant sufficiently understood his rights to waive them." *Id.* It stated the applicable standard: "[C]ourts apply a 'totality of the circumstances' test . . . holding waivers valid 'only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension' on behalf of the suspect." *Id.* at 1168–69 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (further internal quotation marks omitted)). In performing this task, said the court, "[t]he courts must necessarily examine the objective circumstances surrounding the waiver in an effort to determine the suspect's level of understanding." *Id.* at 1169. "Based upon [its] review, including a thorough review of the videotaped interview with [Defendant]," the Colorado Supreme Court

16

concluded "that [Defendant] did sufficiently understand his rights and that the waiver was, therefore, valid." *Id.* at 1167. Accordingly, it reversed the trial court.

The court "[found] support in the record for the trial court's determination that [Defendant] had English abilities adequate for casual conversation." *Id.* at 1170. It acknowledged "that when the detectives spoke in lengthy sentences, the defendant was more apt to become confused, especially when those sentences were spoken rapidly." *Id.* at 1171. "The *Miranda* warnings," however, "were given in unbroken, quickly read, but short sentences." *Id.* The court observed that Defendant "ask[ed] the detectives for clarification when he did not understand a question or a certain word [but] asked no questions during the reading of the *Miranda* warnings." *Id.* at 1172. "Based upon [its] review of the taped interviews," the court decided that Defendant "evidenced a sufficient level of understanding to permit reliance upon his waiver of *Miranda* rights." *Id.*

The court said that it was not necessary that a waiver be "knowing and intelligent in the sense that the tactical error of that decision was . . . perceived," because "it is not in the sense of shrewdness that *Miranda* speaks of intelligent waiver." *Id.* at 1169 (internal quotation marks omitted). Thus, "[t]he defendant need not understand every consequence of his decision to waive." *Id.* In particular:

> [A] defendant's alienage and unfamiliarity with the American legal system should be [considered]. However, *the significance of these factors will be limited to determining whether a defendant knew and understood the warnings that were read to him*. The fact that a defendant's alien status may have prevented him from understanding the full, tactical significance of his decision to confess will not invalidate his waiver.

17

*Id.* at 1169–70 (internal quotation marks omitted). Or, as the court later summed up:

> Whether a defendant had the cultural background to understand the origin or purpose of constitutional rights, or the tactical implications of waiving them, is not at issue. A particular defendant's length of time in the country, education, religion, background, age, and intelligence certainly bear on his depth of understanding. But the relevance of those factors in the totality analysis here is limited to the simple question of whether the defendant grasped three precepts: (1) he did not have to talk, (2) he could have an attorney present, and (3) if he did talk, his statements could be used against him.

*Id.* at 1172. In the court's view, Dr. Kholwadia's testimony did not "dispel the conclusion that [Defendant] had the necessary level of rudimentary understanding." *Id.* It said that "[it] look[s] to whether the defendant minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction." *Id.* It concluded, "Measuring that legal standard against the trial court's findings of historical fact, and our own review of the videotape, we determine that [Defendant's] waiver of his *Miranda* rights was sufficiently knowing and intelligent to pass constitutional muster." *Id.*

The court was not persuaded that Defendant's request for a lawyer after the second *Miranda* warning at the police station was "evidence that he did not understand his right to do so after the first advisement." *Id.* After all, there was an important intervening event. Defendant "took the officers to the dumpster where the body had been located [and] may well have absorbed the extent to which he had implicated himself and began having second thoughts." *Id.*

18

Defendant complains that "the Colorado Supreme Court reduced [the *Miranda*] protections to . . . 'whether the defendant minimally understood that he did not have to talk to the police, that he could request a lawyer, and that, if he spoke, what he said could be used against him to obtain a conviction.'" Aplee. Br. at 33. He contends that clearly established law requires more than a "minimal understanding." *Id.* at 34 (internal quotation marks omitted). But the Colorado Supreme Court recited the correct standard twice before inserting the word "minimally." In context, the phrase "minimally understood" meant only that the defendant must understand *no more than* the following "three precepts: (1) he did not have to talk, (2) he could have an attorney present, and (3) if he did talk, his statements could be used against him." *Al-Yousif I*, 49 P.3d at 1172. A federal court should not "needlessly create internal inconsistency in the [state-court] opinion" where the state court elsewhere "recite[s] the correct . . . standard." *Holland v. Jackson*, 542 U.S. 649, 654–55 (2004) (per curiam).

Defendant also contends that the Colorado Supreme Court failed to consider "critical factors in the constitutionally mandated totality-of-the-circumstances analysis." Aplee. Br. at 24. He asserts that clearly established law "required the Colorado Supreme Court . . . to consider 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Id.* at 30 (quoting *North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979) (emphasis omitted)). He says that the Colorado Supreme Court "fail[ed] to weigh the extent to which [his] difficulties with English and his cultural background may have inhibited his ability to knowingly and

19

intelligently waive his *Miranda* rights under the totality of the circumstances," *id.* at 32, "ignore[d] the 'cursory' nature of the advisement and the context of the exchange between [Defendant] and his interrogators," *id.* at 40, and "refus[ed] to weigh the differences between the first 'cursory' *Miranda* advisement and the second properly delivered *Miranda* advisement by Detective Vigil," *id.* at 44.

As an initial matter, we note that Defendant is relying on decisions of our circuit and other lower federal courts weighing a defendant's language difficulties, cultural background, and familiarity with the criminal-justice system as factors to consider under the totality of the circumstances. But "[o]f course, AEDPA permits habeas relief only if a state court's decision is 'contrary to, or involved an unreasonable application of, clearly established Federal law' as determined by [the Supreme] Court, not by the courts of appeals." *Lopez v. Smith*, 135 S. Ct. 1, 6 (2014) (per curiam). Defendant also cites Supreme Court cases that address waivers of rights other than those protected by *Miranda*. But "Supreme Court holdings—the exclusive touchstone for clearly established federal law—must be construed narrowly and consist only of something akin to on-point holdings." *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008). And because the Supreme Court has stated the relevant *Miranda* requirements in general terms, the Colorado Supreme Court had considerable "leeway . . . in reaching [the] outcome[]." *Yarborough*, 541 U.S. at 664.

In any event, contrary to Defendant's assertions, the Colorado Supreme Court did consider the surrounding circumstances. The court discussed Defendant's English

proficiency at length, referencing the videotaped interview and the witness testimony. It explicitly stated that Defendant's cultural background was relevant to whether Defendant knowingly and intelligently waived his *Miranda* rights. It also considered the circumstances of the exchange between the officers and Defendant, discussing the "rapid reading of the rights . . . and the fact that the position of the form did not allow [Defendant] to read along." *Al-Yousif I*, 49 P.3d at 1170. The court noted Defendant's different responses to the two stationhouse advisements and determined that intervening events may have led to the difference. *See id.* at 1172.

Finally, Defendant argues that the Colorado Supreme Court's finding that he understood his *Miranda* rights is not entitled to the presumption of correctness under § 2254(e). But we have held that whether a defendant understood his *Miranda* rights is a question of fact entitled to deference under AEDPA. *See Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000). We must defer to that finding unless Defendant presented clear and convincing evidence to the contrary. *See id.* Defendant did not do so.

Defendant believes that the record demonstrates that he did not knowingly and intelligently waive his *Miranda* rights. Two trial judges—one state, one federal—agreed with him. But the highest state court did not. Because we review that court's decision with great deference under AEDPA, we cannot grant the relief Defendant seeks.

## III. CONCLUSION

We REVERSE the district court's grant of habeas relief.